1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                    19-CR-557(SJ)(RM)
3   UNITED STATES OF AMERICA,
                                    United States Courthouse
4           Plaintiff,             Brooklyn, New York

5           -against-              May 7, 2021
                                    10:00 a.m.
6   BINBU FENG,

7           Defendant.

8   ------------------------------x

9       TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
             BEFORE THE HONORABLE ROANNE L. MANN
10              UNITED STATES MAGISTRATE JUDGE

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  ANDREW WANG, ESQ.
                                    MARK E. BINI, ESQ.
15                             Assistant United States Attorneys

16  For the Defendant:         FEDERAL DEFENDERS OF NEW YORK
                               One Pierrepont Plaza
17                             Brooklyn, New York 11201
                               BY:  MIA EISNER-GRYNBERG, ESQ.

18

19  Also Present:              STEPHANIE LIU, INTERPRETER
                               DANNY KANG, INTERPRETER
20
    Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, CCR
21                             Phone:  718-613-2330
                               Fax:    718-804-2712
22                             Email:  LindaDan226@gmail.com

23

24

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    2

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Thank you.

4          THE COURTROOM DEPUTY:  Criminal cause for supression

5    hearing.  United States versus Binbu Feng.  Docket Number

6    19-CR-557.

7          Will counsel state their appearances for the record

8    and spell your last name for the court reporter.

9          MR. WANG:  Good morning, Your Honor.  For the United

10   States, Andrew Wang, last name W-A-N-G.

11         And with me is AUSA Mark Bini, last name B-I-N-I.

12         THE COURT:  Good morning.

13         MS. EISNER-GRYNBERG:  Good morning, Judge.  Federal

14   Defenders by Mia Eisner-Grynberg for Mr. Feng.  E-I-S-N-E-R,

15   dash, G-R-Y-N-B-E-R-G.

16         Mr. Feng is F-E-N-G.

17         And we are joined by the Cantonese interpreter.

18         THE COURT:  Is the interpreter previously sworn?

19         THE COURTROOM DEPUTY:  Yes, previously sworn, and

20   this is the second interpreter.

21         THE COURT:  If we can just have them state their

22   appearance for the record, please.

23         THE INTERPRETER:  My name is Stephanie Liu, L-I-U.

24   First name Stephanie, S-T-E-P-H-A-N-I-E.  And the language I'm

25   using is Cantonese.

PROCEEDINGS                                3

1              THE COURT:  Thank you.

2              THE INTERPRETER:  This is interpreter Danny Kang.

3    Last name is K-A-N-G.  Language is Cantonese.

4              THE COURT:  Thank you.

5              Welcome to everyone to this brave new world.  Please

6    be seated.

7              We are proceeding in person in the courtroom for

8    this supression hearing.  We're trying to remain socially

9    distanced.  And I assumed my law clerk spoke with counsel

10   about how we propose to proceed by having the witness actually

11   sit in the jury box, in what would be the foreperson's seat,

12   and with the screen in front of him.

13             And whether or not he wears a mask is at the

14   defendant's option.

15             (Pause in the proceedings.)

16             THE DEFENDANT:  I will wear my mask.

17             No, wear mask.  I prefer him not to wear a mask.

18             THE COURT:  Yes, I heard.  So the witness will not

19   wear a mask.

20             We do have a clear face shield that the witness can

21   wear.  There will also be the large plexiglass shield in front

22   of him.

23             MR. WANG:  Your Honor, to the extent it's relevant

24   for the Court, I've been informed that both of our potential

25   witnesses today have been vaccinated.

PROCEEDINGS                                    4

1          MS. EISNER-GRYNBERG:  And that is also true for

2   myself and Mr. Feng, so we are comfortable proceeding.

3          THE COURT:  All right.  And the Court and Court's

4   law clerks have also been vaccinated.  It's up to the

5   witnesses whether they want to wear -- wear the personalized

6   shields.

7          All right, is there anything that we need to address

8   before we have the government call the first witness on this

9   hearing?

10          MR. WANG:  Your Honor, I think to the extent there

11   are any issues to address, we can wait until after the

12   testimony, if the Court will allow, time for argument.

13          THE COURT:  Is that agreeable to the defense?

14          MS. EISNER-GRYNBERG:  Yes.  Depending on testimony,

15   we may well seek written briefings, but we have nothing before

16   the hearing to discuss.

17          THE COURT:  All right.

18          So who is the government's first witness?

19          MR. WANG:  Your Honor, the government's first

20   witness is investigator Eladio Herrera.  Last name

21   H-E-R-R-E-R-A.  Eladio is E-L-A-D-I-O.

22          THE COURT:  All right.  And he can enter the

23   courtroom and take the witness stand.

24          The defense has asked that the witness not wear a

25   face mask, so if you could remove it.  But there is a

1    plexiglass shield in front of you, and if you would like to

2    have a personalized head shield, a clear head shield, we have

3    that as well.

4                THE WITNESS:  It's all right.

5                THE COURT:  All right, if we can have the witness

6    sworn.

7                (Witness takes the witness stand.)

8    **ELADIO HERRERA**, called as a witness, having been first duly

9    sworn/affirmed, was examined and testified as follows:

10               THE WITNESS:  I do.

11               THE COURTROOM DEPUTY:  Please state and spell your

12   name for the record court reporter.

13               THE WITNESS:  Eladio Herrera.  First name

14   E-L-A-D-I-O, last name H-E-R-R-E-R-A.

15               THE COURT:  Please be seated.

16               And, Mr. Wang, you may proceed.

17               MR. WANG:  Thank you, Your Honor.

18               Sorry, you have a microphone to your left.

19   DIRECT EXAMINATION

20   BY MR. WANG:

21   Q    Good morning, investigator.  Can you tell us where you

22   work?

23   A    I work for the New York State Police.

24   Q    What's your position with the New York State Police?

25   A    I am an investigator with the state police, which is

1    equivalent to a detective.

2    Q    How long have you worked for the New York State Police?

3    A    Twenty-seven years.

4    Q    Do you have prior experience with traffic stops?

5    A    I do.

6    Q    In what capacity were you working when you did traffic

7    stops previously in your employment?

8    A    Well, before becoming an investigator or being promoted

9    to investigator, I was a road trooper for the New York State

10   Police conducting vehicle traffic stops, going to complaints

11   and so forth.

12   Q    How long did you work as –– was it as a trooper or an

13   officer?

14   A    Trooper.

15   Q    How long did you work as a trooper?

16   A    I was on the road for six years.

17   Q    And since then you've been an investigator?

18   A    Correct.

19   Q    When you were a trooper, how often did you stop cars

20   where there was a detectable smell of marijuana?

21   A    All the time.  All the time.

22   Q    And through your –– so through your experience as a

23   trooper, have you ever spoken to drivers in Spanish?

24   A    I have.

25   Q    How often have you done that?

1   A    Through my career, several times.  A lot.  More than I

2   can count, probably.

3   Q    And we'll get to the Spanish part again later.  But,

4   investigator, are you currently employed as a task force

5   officer any where?

6   A    I am.

7   Q    Where are you a task force officer?

8   A    With the Drug Enforcement Administration.

9   Q    How long have you been a DEA task force officer?

10  A    It's been over -- it's been a while, but at a minimum,

11  over five years.

12  Q    As a task force officer, what sort of cases do you

13  investigate?

14  A    Our group primarily deals with money laundering cases.

15  But occasionally we will cross over to drugs as well.

16  Q    Investigator, during the six years or so that you were a

17  trooper, could you approximate how many car stops you made

18  during that time?

19  A    Hundreds.

20  Q    So it was a fairly regular occurrence in your line of

21  work?

22  A    Yes.

23       MR. WANG:  At this time, Your Honor, I'd ask that

24  the defendant briefly remove his mask so that he can make an

25  identification.

Case 1:19-cr-00557-ARR   Document 68   Filed 05/19/21   Page 8 of 97 PageID #: 160

1          THE COURT:  All right.

2    Q    Investigator, do you see anyone in the courthouse -- the

3    courtroom today that you previously encountered in your

4    capacity as a DEA task force officer?

5    A    I do.

6    Q    Could you please point to him and indicate an article of

7    clothing?

8    A    The gentleman with the black sweatshirt.

9          MR. WANG:  Let the record reflect that the witness

10   has identified the defendant.

11         THE COURT:  Yes.

12   Q    Investigator, are you familiar with an individual named

13   Hanhe Chen?

14   A    I am.

15         MR. WANG:  And for the reporter that's H-A-N-H-E,

16   last name C-H-E-N.

17   Q    Investigator, how is it that you're familiar with Hanhe

18   Chen?

19   A    Mr. Chen was the subject of the investigation.

20   Q    Could you describe what investigation that is?

21   A    It was a money laundering case that had been developed by

22   the DEA, and he was the target of the investigation.

23   Q    In general terms, what sort of evidence had the DEA

24   previously developed that Hanhe Chen was engaged in money

25   laundering activities?

1   A    There had been a couple -- there had been a couple of

2   seizures, money seizures, that had been connected to him.

3   Q    I think you know, approximately what were the size of

4   those seizures?

5   A    I don't know, but one of them was close to a million

6   dollars.  And the other one was quite substantial amount of

7   money as well.

8   Q    And to your knowledge, what did the DEA believe the

9   source of those proceeds to be?

10  A    From drugs.

11  Q    By October 2019, was the DEA's investigation into Hanhe

12  Chen with respect to money laundering active?

13  A    It was.

14  Q    And were you a personally -- did you personally

15  participate in that investigation of Mr. Hanhe Chen?

16  A    I did.

17  Q    And in October of 2019, was the DEA actively surveilling

18  the activities and movements of the Hanhe Chen?

19  A    They were.

20  Q    In the course of that surveillance, did you encounter the

21  defendant, Binbu Feng?

22  A    We did.

23  Q    So I'd like to ask you about October 28th, 2019.

24       Were you working that day?

25  A    I was.

1    Q    What was your assignment that day?

2    A    I was part of the task force team that was out there

3    doing the surveillance.

4    Q    Approximately how many others officers were assigned to

5    the surveillance team that day?

6    A    Between eight and ten at the time, if I recall correctly.

7    Q    That day for the surveillance, did team members travel in

8    cars?

9    A    I'm sorry.

10   Q    During the surveillance that day, did the team members

11   travel in cars?

12   A    They did.

13   Q    How many cars did the team take?

14   A    Everyone had their own vehicle.

15   Q    In other words, each individual member had their own

16   vehicle that day?

17   A    Correct.

18   Q    Being spread out in separate vehicles like that, how did

19   members of the surveillance team keep in contact with one

20   another?

21   A    Through the radio.

22   Q    How actively did the surveillance team member maintain

23   contact with each other through the radio in terms of passing

24   along information?

25   A    It was constant updates.  Everything that was going on,

1    whoever had the eye, it was constantly, you know, being made

2    abreast of everything that was going on.

3    Q    I'm sorry, did you say "whoever had the eye"?

4    A    Whoever might have had the eye, whoever had the actual

5    eye on the target, would be letting us know what was going on.

6    Q    At any point on October 28th, 2019, did you personally

7    observe the activities of Hanhe Chen?

8    A    I did.

9    Q    Describing from the first instance you had visual contact

10   with Hanhe Chen, what did you see him do that day?

11   A    He was going into between two storage facilities that we

12   were looking at, and he was going back and between these two

13   buildings.

14   Q    Did you have any visual contact with Hanhe Chen before he

15   was at those storage facilities?

16   A    Yes, we did.

17   Q    Can you describe that?

18   A    He had originally started from his residence and we had

19   followed him.  That morning.  Or that day.  Excuse me.  And he

20   had basically taken us to this location.

21   Q    Do you recall geographically where those storage

22   facilities were?

23   A    Yes, they were, they were just off the BQE, the Brooklyn

24   Queens Expressway, just over the line into Brooklyn.

25   Q    So you said that you at some point observed him moving

1    back and forth between two storage facilities.

2    A    Correct.

3    Q    Did you observe when he was at those locations, anyone

4    else with him?

5    A    At that time I was observing him, no, I did not observe

6    him with anyone.

7    Q    And you said at one point there was a second storage

8    facility involved, correct?

9    A    Yes.

10   Q    By the time Hanhe Chen was at the second storage

11   facility, did you still have direct visual observation of him?

12   A    At one point in time I did.  I was in the rear of the

13   building looking at where he could come inside.

14            And then when he actually came out from that

15   facility and walked back out, I switched my position and

16   someone else went and took my stop.

17   Q    You said that you were in the back area of that facility.

18   Could you describe a bit in more detail what is in the back of

19   that?

20   A    Yeah, it was the loading dock of the storage facility.  I

21   think was a CubeSmart, if I'm not mistaken.

22   Q    Is that a self-storage facility?

23   A    Self-storage-type place, yes.

24   Q    You said at that point, after some brief surveillance in

25   that area, you switched positions, correct?

1   A     Correct.

2   Q     Why did you leave the second storage facility?

3   A     Well, one of the reasons was so as to not compromise the

4   surveillance.

5           If you stay in one place too long, people get to see

6   you, then you can compromise the surveillance.  So that was

7   the goal to move, and then someone took my spot.

8   Q     When you moved away from the second storage facility,

9   where did you go?

10  A     I just went to the outer perimeter of the building on the

11  street.

12  Q     At that point, who else from the surveillance team was

13  with you, if anyone?

14  A     I know that the group definitely entailed Special

15  Agent Callahan, Special Agent Farquharson, and there was two

16  other guys in the area.

17  Q     And I think you mentioned that somebody took your place

18  after you left?

19  A     Right.

20  Q     In other words, did other team members maintain

21  continuous visual surveillance --

22  A     Yes.  Yes.

23  Q     Afterwards, did members of the team that had the eye, as

24  you said, continue to update other members of the team as to

25  what they were observing at the storage facility?

1    A    Yes.

2    Q    After you lost visual contact with the storage facility,

3    and moved to that further area, what, if anything, did you

4    learn from individuals who were still directly observing the

5    storage facility?

6    A    Well, we had learned that there had been now –– Mr. Chen

7    had been joined by a couple other males.  And some vehicles.

8    And that at some point in time, we also learned that there was

9    some items that were brought to the –– to the loading dock

10   area.  And were being loaded into these vehicles.

11   Q    You mentioned that there were several other males,

12   correct?

13   A    Correct.

14   Q    Did you receive a visual description as to those other

15   males?

16   A    Yes.

17   Q    What was that description?

18   A    Basically they told us there were two –– three more Asian

19   males that had joined Mr. Chen.

20   Q    For the record, is Hanhe Chen an Asian male?

21   A    Yes.

22   Q    And you said they were loading items into vehicles,

23   correct?

24   A    Correct.

25   Q    Can you describe in more detail what those items were to

1    the extent --

2    A    Yes, they had described it as being large, plastic

3    garbage bags, heavy weighted, being put into the back of the

4    vehicles.

5    Q    Did you also receive a visual description of the vehicles

6    you mentioned?

7    A    Yes, one of the vehicles was, if I recall correctly, was

8    a pickup truck.  And the other vehicle, which I was part of

9    the stop, was a Sienna Toyota minivan.

10   Q    Based on your training and experience, when you learned

11   that individuals who are being observed as part of a money

12   laundering investigation are handling large weighted bags,

13   what did you generally conclude as to what might be in those

14   bags?

15   A    Conclude that it could possibly have been U.S. currency,

16   money.

17   Q    Anything else?

18   A    Possibly drugs as well.

19   Q    Why would you think there might be drugs?

20   A    Just because of the nature of what we were dealing with.

21   And typically money laundering cases will cross over with the

22   drugs.

23   Q    By the time you were at that second location, the

24   perimeter of the facility, did you make any car stops in

25   relation to the surveillance?

HERRERA - DIRECT - WANG                    16

1    A    We were instructed over the radio when the two vehicles

2    started -- well, we were instructed to go pull these cars

3    over, we were specifically assigned to the minivan, at which

4    point in time Special Agent Callahan and Farquharson, did pull

5    the vehicle over.  I was -- I joined them shortly thereafter.

6    Q    And when you say "Farquharson," is that Special Agent

7    Ricardo Farquharson?

8    A    Yes, Farquharson.  I'm sorry, yes.

9    Q    Typical name?

10   A    Yes, yes.

11   Q    Where did the stop of that minivan occur?

12   A    The stop occurred right as the entrance into the BQE, of

13   the Brooklyn Queens Expressway on the streets.

14   Q    And I think you've already offered some information on

15   this, but more specifically, what led you to stop the minivan?

16   A    Well, due to the fact that the information that we had

17   received, and the information regarding what was loaded into

18   the vehicle, that gave us, you know, reason to stop.

19           And then I, if I'm not mistaken, they had stopped

20   him for a violation of a vehicle traffic law.

21           MS. EISNER-GRYNBERG:  Objection.

22           THE COURT:  Sustained.

23           You can rephrase the question.

24   BY MR. WANG:

25   Q    Investigator, to your knowledge, were there any other

1  reasons why the car was pulled over?

2  A    Due to the fact that there was a violation of -- which I

3  recall, if I recall correctly, the vehicle traffic law.

4  Q    What is the basis of that knowledge?

5  A    Because I -- it was put over the radio.

6          Just mind you, at that time, there's a lot radio

7  traffic as well.

8  Q    But just to clarify, you heard over the radio that there

9  was a traffic violation?

10 A    Yes.  Yes.

11 Q    Did you personally observe any traffic violations occur?

12 A    I did not.  I joined -- you know, I joined them after the

13 fact.

14 Q    To be clear, the basis for your knowledge that there was

15 a traffic violation is your hearing that over the radio?

16 A    Correct.

17 Q    After the car was stopped, did you approach it?

18 A    Once -- once the vehicle was stopped, I had approached

19 the vehicle shortly thereafter.  They were already out of

20 vehicle when I approached.

21 Q    At that time, who was driving the car?

22 A    Mr. Feng was driving the vehicle.

23 Q    Was anyone else in the car at that time?

24 A    No.

25 Q    Which side of the car did you approach?

1    A    On the passenger's side.

2    Q    When you were approaching the car from the exterior, what

3    could you smell coming from the car, if anything?

4    A    I did smell the odor of marijuana.

5    Q    Can you explain at what point you smelled marijuana

6    during your approach to the car?

7    A    When I approached on the passenger side, the window was

8    down, I poked my head in, my nose in, to make sure where it

9    was coming from.  And that's when I got a scent.

10   Q    Putting your head inside, even just for a little bit of a

11   car, why would you do that?

12   A    Well, the other reason I did it also was just to make

13   sure that we were safe.  That there were no -- that I could

14   see no weapons in the open.  And just to make sure nobody else

15   was in the car.

16           Because of the layout of the minivan, somebody could

17   be laying in the back.  More tactful than anything, just to be

18   on the safe side.

19   Q    Is that a common practice during traffic stops?

20   A    For us it is.

21           Mind you, as a road trooper, you're on the road by

22   yourself.  You're pulling cars over by yourself.  So you

23   always have to be safe.  So it's something that's inherent,

24   something that we -- you know, after 27 years, it's something

25   that's just kind of part of what you do.

1    Q    When you approached the driver initially, were you able

2    to communicate with him?

3    A    Initially, no.  Initially we not able to -- we were sign

4    language type of thing, but we weren't really because he

5    didn't speak English.

6    Q    So does that mean initially you attempted to speak to him

7    in English?

8    A    We did.

9    Q    When you attempted to speak to him in English, were you

10   able to communicate with him at that point?

11   A    To a point where we were able to get his license and

12   certain information.

13        He also responded to when we asked him to get out of

14   the vehicle.

15   Q    Did there come a time when you spoke to him in a

16   different language?

17   A    We did, yes.

18   Q    What language was that?

19   A    Spanish.

20   Q    Why did you start speaking to him in Spanish?

21   A    When we had him out of the vehicle and were on the

22   passenger's side, in trying to communicate with him, there was

23   another colleague that had come by that talked Spanish.  And

24   Mr. Feng said, You know, I speak Spanish.

25   Q    This was another member of the surveillance team?

1    A    Yes.

2    Q    Which officer was that?

3    A    If I recall correctly, I believe it was

4    Investigator Gonzalez.

5    Q    Officer Herrera, do you speak Spanish?

6    A    I do.

7    Q    How did you learn Spanish?

8    A    It's -- I grew up in the household.

9    Q    Could you just generally describe what your household

10   background is?

11   A    My father's from Cuba.  My mother's Dominican.  And we

12   grew up speaking Spanish.

13   Q    What's your level of proficiency in Spanish?

14   A    I -- I understand, speak and write.

15   Q    Would you say you're fluent?

16   A    Yes.

17   Q    In the course of your duties as a trooper and

18   investigator, do you ever use Spanish?

19   A    Yes.

20   Q    How do you use Spanish in your job as a trooper and

21   investigator?

22   A    Several times where people don't -- might not understand

23   English or whatever and they speak Spanish, then that's how we

24   engage, just to, you know, get that communication going.

25   Q    When you were a trooper, how often did you speak Spanish

1    with motorists that you pulled over?

2    A    A lot.

3    Q    You said at some point the defendant told you that he

4    speaks Spanish.

5    A    Yes.

6    Q    At that point, how effectively were you able to

7    communicate with him in Spanish?

8    A    Pretty effective.

9    Q    And during your conversation with the defendant in

10   Spanish, what, if anything, did you ask him about the car?

11   A    I asked him who the vehicle belonged to.  I asked him

12   where he was coming from.  I asked him, you know, if there was

13   anything in the vehicle we should know about.  You know,

14   things like that.

15          And then at some point in time I asked him if we can

16   look in the vehicle.

17   Q    To the best of your ability, can you recall exactly what

18   you asked him with regards to looking inside the vehicle?

19   A    I asked him is it okay -- in Spanish, I asked him if it's

20   okay if we take a look what's in the vehicle.

21   Q    How did he respond -- did the defendant appear to

22   understand that question?

23   A    I believe he understood it.  I -- yeah.  I believe that

24   he understood what I was trying to ask him.

25   Q    What makes you think he could understand what you were

1  asking?

2  A    He was acknowledging, he was -- you know, there was a

3  difference in when we spoke English to him, and then when we

4  spoke Spanish to him, completely different body language, you

5  know.

6  Q    I'm sorry if this is an obvious question, but what is

7  that difference between the English and Spanish when you were

8  speaking to the defendant?

9  A    He understood what was being asked.

10  Q    After you asked him in Spanish if you could look inside

11  the vehicle, how did the defendant respond?

12  A    He nodded his head, he said "Sí," you know.

13  Q    I'm sorry, did you say --

14  A    He nodded his head and said "Sí".

15  Q    What does "Sí" mean in Spanish?

16  A    Yes.

17  Q    After the defendant said "sí," or, yes, in Spanish, what

18  happened next?

19  A    We walked to the back of the vehicle.  He was there with

20  us.  And we proceeded to open the latch, the back door.

21  Q    Now prior to opening the latch of the door, could you

22  describe the tone of the conversation between you and the

23  defendant?

24  A    It was cordial -- it was cordial -- yeah, it was cordial,

25  there was no -- you know, nothing -- nothing crazy.  It was

1  very cordial, very -- it was nice.

2  Q    After you opened the back of the car, what did you

3  observe there?

4  A    There were two large bags that had been described prior

5  in the back of that vehicle.

6  Q    Did you look inside the bags?

7  A    Yes, we did look inside the bags.

8  Q    And what did you find inside?

9  A    There was marijuana.

10  Q    Could you describe how the marijuana was packaged?

11  A    It was packaged in these sealed bags, plastic sealed

12  bags.

13  Q    At any point during this car stop, did you or anyone else

14  threaten the defendant in any language?

15  A    No.

16  Q    Did -- at any point during this car stop, did you or

17  anyone else coerce the defendant in any way?

18  A    No.

19  Q    Prior to opening the back of the car, did you or anyone

20  else physically restrain the defendant in any way?

21  A    No.

22  Q    After finding the bags of marijuana in the back of the

23  vehicle, what did you do with the defendant?

24  A    He was placed in custody at that time.

25  Q    Does that include handcuffs?

1    A    Yes.

2    Q    When you opened the back of the van, you described that

3    there were two plastic bags, correct?

4    A    Correct.

5    Q    What else in terms of your senses, did you detect at that

6    time?

7    A    The smell of the cannabis, the marijuana.

8    Q    And can you describe -- we'll get to a picture of this --

9    but can you describe from your memory the back of that van?

10   A    Well, it was a storage, like where you put luggage in the

11   back of the van.  It's an open area.  Two bags were, like I

12   said, heavy duty garbage bags.  Dark colored.  Packed.

13            MR. WANG:  Your Honor, permission to show the

14   defendant Government Exhibit 1.

15            THE COURT:  Certainly.

16            (Exhibit published.)

17   Q    Investigator, I'm showing you what's been marked as

18   Government Exhibit 1.

19            Do you recognize Government Exhibit 1?

20   A    I do.

21   Q    How do you recognize this?

22   A    This is the back of the van at the stop where the stop

23   was conducted.  And those are the two bags that were, you

24   know, I told you about.

25   Q    Do you recall what the quantity of substance recovered

1    from the bags was?

2    A    I don't, but I can say that it was substantial.

3    Q    If you had to estimate, would you say it was more than a

4    hundred pounds?

5    A    If not -- close, or if not more.

6         MR. WANG:  Permission to show the witness Government

7    Exhibit 2.

8         THE COURT:  Are you offering it in evidence?

9         MR. WANG:  I will after I show --

10        THE COURT:  All right.

11        (Exhibit published.)

12   Q    Investigator, I'm showing you what's been marked as

13   Government Exhibit 2.

14        Do you recognize Government Exhibit 2?

15   A    I do.

16   Q    How do you recognize Government Exhibit 2?

17   A    This is one of the bags that were open to see what was in

18   it, and there's the sealed baggage, and what was in it was the

19   marijuana.

20   Q    Just for the record, when you say there's a sealed bag,

21   are you referring to the -- what appears to be some clear

22   plastic packaging?

23   A    Yes.

24   Q    Is that how the marijuana recovered was packaged?

25   A    Yes.

1      MR. WANG:  Investigator, I'm going to now show you

2  what's been marked as Government Exhibit 5.

3      (Exhibit published.)

4  Q    Do you recognize Government Exhibit 5?

5  A    I do.

6  Q    How do you recognize this?

7  A    That's Mr. Feng.  And that's him by one of the vehicles

8  that conducted the stop.

9  Q    Based on what you see in this photograph, does it appear

10  that he has been arrested by this point?

11  A    At this point, it looks like it, yes.

12  Q    What makes you say that?

13  A    His hands are behind his back.

14  Q    Investigator, are Government Exhibits 1 and 2 fair and

15  accurate representations of the bags you recovered from the

16  back of the Toyota Sienna?

17  A    Yes.

18  Q    And is Government Exhibit 5 a fair and accurate

19  representation of the defendant at the time of his arrest?

20  A    Yes.

21      MR. WANG:  Your Honor, at this time I would move to

22  admit Government Exhibits 1, 2 and 5.

23      MS. EISNER-GRYNBERG:  No objection.

24      THE COURT:  Received.

25      (Government Exhibit 1, was received in evidence.)

1          (Government Exhibit 2, was received in evidence.)

2          (Government Exhibit 5, was received in evidence.)

3          MR. WANG:  Investigator, I'm showing you what's been

4    marked as Government Exhibit 4.

5          (Exhibit published.)

6    Q    Investigator, do you recognize Government Exhibit 4?

7    A    Yes, I do.

8    Q    How do you recognize it?

9    A    This is the loading dock area of the storage facility.

10   It's the back part where they would come out.  There's –– the

11   van is there.  And then I see the other –– where they brought

12   out the –– whatever was in that container.

13   Q    When you say "the van," which vehicle are you referring

14   to?

15   A    The Sienna van.

16   Q    Is that the vehicle that's in the middle right portion of

17   this picture?

18   A    Correct.

19   Q    And is that the same Toyota Sienna that you stopped on

20   October 28th?

21   A    It appears to be, yes.

22   Q    How was it that you recognize this to be the loading

23   dock?

24   A    That's where I was initially for the surveillance,

25   earlier in the surveillance.

Case 1:19-cr-00557-ARR   Document 68   Filed 05/19/21   Page 28 of 97 PageID #: 180

1    Q      Did you take this photo?

2    A      I did not.

3    Q      How did you receive it then?

4    A      I received this photo.

5    Q      Actually, strike that.

6           Have you previously seen this photo?

7    A      I have.

8    Q      When did you last see this photo?

9    A      Last night.

10   Q      How did you receive it?

11   A      The co-case agent had sent it to me.

12   Q      Who is that individual?

13   A      Task force Officer Boucher.

14   Q      Is that Tyler Boucher?

15   A      Yes, it is.

16   Q      And did he inform you as to the nature of this

17   photograph?

18   A      He told me to look at this, it was pertaining to the

19   case.

20   Q      And did you discuss with him, again, the content and

21   nature of this photograph?

22   A      Basically I did.

23   Q      And based on what you recognize this area to be and your

24   observations from that night and the information you received

25   from Officer Boucher, is this a fair and accurate

1    representation of the events that were described to you at the

2    loading dock on October 28th, 2019?

3    A    Yes.

4         MR. WANG:  Your Honor, at this time the government

5    moves to admits Government Exhibit 4.

6         MS. EISNER-GRYNBERG:  May I *voir dire* the witness?

7         THE COURT:  You may.

8    VOIR DIRE EXAMINATION

9    BY MS. EISNER-GRYNBERG:

10   Q    Officer Herrera, you stated that you were located at the

11   perimeter of the storage facility; is that right?

12   A    At one point in time, yes.

13   Q    You were at the perimeter at the point in time when you

14   say bags were being loaded into Mr. Feng's van, right?

15   A    Correct.

16   Q    So what you see on the screen here, you did not see with

17   your own eyes, correct?

18   A    No, ma'am.

19   Q    So you have no idea whether what's depicted here is an

20   accurate depiction of what was happening at the van that day,

21   right?

22   A    Well, I relied on what was -- what I was being told.

23   Q    Right.  So aside from what you were told by somebody who

24   is not here, you can't personally authenticate what's

25   happening in this picture, right?

1    A    I can only go by what I was told.

2            MS. EISNER-GRYNBERG:  Judge, I'd object to the

3    admission of this photograph into evidence.

4            This witness has no firsthand knowledge by which to

5    say that this was at the same date or time, or that these are

6    the correct individuals or the correct van, or even the

7    correct storage location where this picture was taken.  It's

8    not sufficient to lay the foundation.

9            MR. WANG:  Your Honor, if I may respond?

10           THE COURT:  You may.

11           MR. WANG:  First I would *voir dire* the witness a

12   little bit more.

13   VOIR DIRE EXAMINATION

14   BY MR. WANG:

15   Q    Investigator, zooming in on this photograph, I think

16   you've already identified this vehicle as being of a similar

17   make and model as the one you stopped on October 28th,

18   correct?

19   A    Correct.

20   Q    And this was something you received from the co-case

21   agent for this investigation, correct?

22   A    Correct.

23   Q    And based on your discussion with him, you understood

24   this to be a surveillance photograph from that day?

25   A    Yes.  Correct.

1   Q    Looking at the individuals depicted in this photograph,

2   can you identify any of the people depicted here?

3   A    I can definitely identify the subject who is on the phone

4   right there.

5   Q    And for the record, are you describing the individual who

6   appears to be holding an object to his left ear?

7   A    Correct.

8   Q    Who is that individual?

9   A    Mr. Feng.

10  Q    What is the basis for that identification?

11  A    He's wearing the same outfit.  He's got the Nike logo on

12  his jacket.

13  Q    Is that the same Nike logo jacket depicted in Government

14  Exhibit 5?

15  A    It is.

16  Q    In Government Exhibit 5, can you describe what that Nike

17  logo looks like?

18  A    Yes, it's a black sweatshirt and it's white with the

19  white signature on it.

20  Q    And looking again at Government Exhibit 4...

21  A    And it's over the left breast.

22  Q    Can you describe what you see this individual, who

23  appears to be holding a phone, how -- what you can see in that

24  photograph?

25  A    The black hoodie with the white Nike swish over his left

PROCEEDINGS                    32

1    breast.

2              MR. WANG:  Your Honor, in response to the defense's

3    objection, to make a couple of points.

4              First, this is a Rule 104 preliminary proceedings,

5    so the rules of evidence don't apply here.  And, of course,

6    under Rule 1101(d)(1) also makes that clear, that the rules of

7    evidence don't apply here.

8              This evidence, in addition to Investigator Herrera

9    having made a proper foundation, based on his discussion with

10   a knowledgeable case agent, his knowledge of what occurred

11   that day, his personal observations of the appearance of this

12   loading dock, the identification of the same make and model

13   car, the positive ID of an individual who bears a very similar

14   resemblance in this photograph of Government Exhibit 5, all

15   that information, not only authenticates the document, but

16   also bearing on the relevance of this document as being

17   corroborative of what Investigator Herrera saw that day and

18   what he said he learned from other officers.

19             THE COURT:  Let me just ask the witness:

20             What time of day was this surveillance taking place?

21             THE WITNESS:  At this point in time, it was later on

22   in the day, it was early evening.

23             THE COURT:  And by "early," what time are you

24   referring to?

25             THE WITNESS:  About 5-ish, 5, 6:00 in the evening

PROCEEDINGS                                    33

1    roughly, if my memory serves me correct.

2              MR. WANG:  Your Honor, I would also note that this

3    particular imagine was previously produced as Feng Number 10,

4    and it was specifically cited in the government's opposition

5    brief for this motion.  While not attached as an exhibit, it

6    was cited and described as depicting the defendant and other

7    individuals loading items on the loading dock on the date in

8    question.

9              THE COURT:  Ms. Eisner-Grynberg, do you want an

10   opportunity to reply?

11             MS. EISNER-GRYNBERG:  Yes, Judge.

12             The government does have the burden of going forward

13   with witnesses with personal knowledge so that myself, on

14   behalf of Mr. Feng, can cross-examine the witness on what he

15   saw.  And there is nothing stopping the government from

16   calling any witness who either took this photograph or was

17   present and personally observed what's depicted here.

18             For this witness to simply say somebody else told me

19   that this was taken that same day and time and that's what

20   somebody else saw, deprives Mr. Feng of the ability to

21   cross-examine a witness with actual knowledge to determine if

22   that is in fact true.

23             THE COURT:  All right.  I'm going to overrule the

24   objection.

25             I'll receive this exhibit in evidence, but the

1   arguments about whether or not this witness can sufficiently

2   identify when this was taken, that will go to the weight that

3   the Court will afford to it.

4            (Government Exhibit 4, was received in evidence.)

5   DIRECT EXAMINATION (Continued)

6   BY MR. WANG:

7   Q    Investigator, I'm going to ask you some additional

8   questions about Government Exhibit 1.

9            Again, with reference to this photograph in

10  Government Exhibit 1, can you describe the trunk of the

11  vehicle?

12  A    The trunk of the vehicle is basically behind the third

13  row seat.  It's an open area.  It's basically what in another

14  vehicle would be the actual trunk, it's just not separated by

15  actual seats and so forth.

16  Q    Is there anything obstructing or separating this trunk

17  from the rest of the cabin of the vehicle?

18  A    No.  In fact, you can -- that third row, you can slide

19  down and it opens all up.

20  Q    In other words, this is a standard minivan?

21  A    Correct.

22  Q    Is there anything depicted in Government Exhibit 1 that

23  is a self-covering or sealing the black plastic bags?

24  A    No.

25  Q    I think you testified earlier that after you found the

1    marijuana, you arrested the defendant; is that correct?

2    A    Correct.

3    Q    Before arresting the defendant -- and I asked you some

4    questions about this before -- but before arresting the

5    defendant, did you or anyone else physically restrain him in

6    any way?

7    A    No.

8    Q    Were you and the other officers on site armed that day?

9    A    We were.

10   Q    Before arresting the defendant, did you or anyone else

11   draw a weapon at that car stop?

12   A    No.  Not that I recall.

13   Q    After arresting the defendant, what happened to him?

14   A    He was placed in one of the vehicles and transported down

15   to DEA headquarters.

16   Q    Did you then go to the DEA headquarters?

17   A    I did.

18   Q    Did you speak with the defendant at DEA headquarters?

19   A    I did.

20   Q    In what language did you speak?

21   A    In Spanish.

22   Q    If you know, by the time you spoke with the defendant at

23   DEA headquarters, had he been read his *Miranda* rights?

24   A    If I recall correctly, someone did read him his *Miranda*

25   rights.

1    Q    What's the basis for that knowledge?

2    A    It should be -- well it's usual standard procedure that

3    they do.

4    Q    But to be clear, did you directly observe anyone

5    *Mirandize* him?

6    A    I did not.

7    Q    To your knowledge, did the defendant ever invoke his

8    right to counsel at the DEA headquarters?

9    A    Not that I recall.

10   Q    You indicated that you continued speaking with the

11   defendant in Spanish at DEA headquarters, correct?

12   A    Correct.

13   Q    During that second postarrest conversation, did the

14   defendant at any point indicate that he had difficult

15   understanding what you were saying in Spanish?

16   A    Not at all.

17   Q    During that second conversation, at any point did you

18   have difficulty understanding what the defendant was saying in

19   Spanish?

20   A    Not at all.

21   Q    During the course of the conversation, what, if anything,

22   did the defendant say about him living in a Spanish-speaking

23   country?

24   A    Well, the conversation started out because I, you know,

25   wanted to know, Hey, how did you learn Spanish?  And in the

1    background, he had told me he migrated from China to

2    Venezuela.

3    Q    Did he tell you how long he lived in Venezuela?

4    A    If I recall correctly, it was over five years I think

5    that he was in Venezuela.

6    Q    During your interactions with the defendant at DEA

7    headquarters, did the defendant act as a translator for

8    anyone?

9    A    He did.  He did help us out.

10   Q    How did he do that?

11   A    One the other subjects that was in custody did not speak

12   English or Spanish, and he was able to translate for us.

13   Q    What languages was he using when he was translating?

14   A    Spanish and Chinese.

15   Q    In other words, the other individual that needed

16   translation services was speaking Chinese?

17   A    Correct.

18   Q    And then the defendant translated that Chinese into

19   Spanish for your benefit?

20   A    Correct.

21   Q    And to be clear, that translation, in what context did

22   that occur?

23   A    Basically to retrieve pedigree information from the

24   subject also so that we can do the proffer checks to make sure

25   that nobody's wanted or -- or here illegally, whatever.  You

1    know, protocol.

2    Q    Investigator, based on your conversation with the

3    defendant, both before and after his arrest, how did you judge

4    defendant's level of fluency in Spanish?

5    A    As good as I am.  He could speak.  We had a candid

6    conversation and, you know, pleasant conversation.  We were

7    going back and forth.

8    Q    And going back to the car stop, I just want to ask a

9    couple more questions there.

10           I believe you testified earlier that you had

11   received information over the radio, nothing you personally

12   observed, but information over the radio that a Toyota Sienna

13   should be stopped, correct?

14           By the time you received that information, had you

15   formed any sort of belief with respect to potential criminal

16   activity being committed by the driver of that vehicle?

17   A    Yes.

18   Q    What was your belief at that point?

19   A    We just -- because of what we had learned, the

20   information that we received, and because of the nature of the

21   case, we either felt that there was drugs or money there.

22           MR. WANG:  Your Honor, no more questions at this

23   time.

24           THE COURT:  All right.  Cross-examination?

25           MS. EISNER-GRYNBERG:  Yes.

HERRERA - CROSS - EISNER-GRYNBERG                    39

1        May I have a moment to consult with my client with

2   the interpreter, please?

3              THE COURT:  Certainly.

4              Do we need to take a break?

5              MS. EISNER-GRYNBERG:  No, just a minute.  Thank you.

6              (Pause in the proceedings.)

7   CROSS-EXAMINATION

8   BY MS. EISNER-GRYNBERG:

9   Q    Good morning.  Is it Officer Herrera?

10  A    Investigator.

11  Q    Investigator, okay.

12  A    You can call me by my first name, if you like.

13  Q    So we've been discussing surveillance that you were

14  conducting on October 28th of 2019, correct?

15  A    Correct.

16  Q    That was about 18 months ago, a bit more, right?

17  A    Yes.

18  Q    You testified that the target of your surveillance was a

19  man named Hanhe Chen, right?

20  A    Yes.

21  Q    And you said you had been investigating him for about six

22  months at that point?

23  A    Approximately, on and off.  Yeah.

24  Q    So it's fair to say that the target of your investigation

25  was not Binbu Fen, right?

1   A     Correct.

2   Q     You mentioned seizing about a million dollars from Hanhe

3   Chen, correct?

4   A     Yes.

5   Q     You had never seized any money or drugs from Mr. Feng,

6   right?

7   A     Not until we made the stop.

8   Q     Until the day you stopped him, you had not been

9   investigating Binbu Feng at all, right?

10  A     Correct.

11  Q     I'm sorry?

12  A     Correct.

13  Q     You just simply happened upon Mr. Feng on October 28th,

14  2019, while you were investigating somebody else; is that

15  fair?

16  A     Correct.

17  Q     And it was while you were investigating Hanhe Chen that

18  you tracked him to two storage facilities, correct?

19  A     Correct.

20  Q     You testified that at the time he was at storage

21  facility, you only personally saw him alone; is that right?

22  A     Correct.

23  Q     Did you ever see him meet up personally with any other

24  individual?

25  A     On that date or prior?

HERRERA - CROSS - EISNER-GRYNBERG                41

1    Q    On that date.

2    A    On that date, I did not.

3    Q    So the basis and the extent of your knowledge at the

4    storage facility was tracking Mr. Hanhe Chen from his home to

5    the storage unit, right?

6    A    Uh-huh.

7    Q    And then you went to the perimeter, correct?

8    A    Correct.

9    Q    It was after you went to the perimeter, after seeing

10   Hanhe Chen, that Mr. Feng drove out of the storage unit,

11   correct?

12   A    Correct.

13   Q    Did you see his van actually leave the parking lot?

14   A    I did not see his van leave the parking lot.

15   Q    How did you then know to leave the storage facility and

16   begin to pursue another car?

17   A    I was on the street and through the -- the transmissions

18   on the radio, description of the vehicle was given, and we

19   were told to stop it.

20   Q    So you did not see garbage bags enter Mr. Feng's van,

21   correct?

22   A    No, I did not.  Not with my own eyes.

23   Q    You saw Chen enter the storage facility area, right?

24   A    Right.

25   Q    And the next thing that happened to you personally, is

1    you were told to pursue a Toyota Sienna; is that right?

2    A    Correct.

3    Q    So you did proceed out of the storage facility area --

4    A    At that time I was not in the storage facility.  I was on

5    the outside.  There was another person back there.

6    Q    So you were somewhere in the neighbor near the storage

7    facility?

8    A    Right by it.  I was just up the street, a block from the

9    storage facility.

10   Q    And somebody told you where to go in order to pursue the

11   Toyota Sienna?

12   A    Correct.  Correct.  Yes.

13   Q    You ended up finding Mr. Feng's van traveling down in the

14   direction of the BQE; is that right?

15   A    Towards the BQE, yes.

16   Q    And you said that you heard over the radio a direction

17   that the Toyota Sienna should be pulled over, correct?

18   A    Yes.

19   Q    You are not the person that pulled over that vehicle?

20   A    Not initially, no, ma'am.

21   Q    So let me understand where you were when you heard over

22   the air that that car should be pulled over.

23         Were you directly behind the car that pulled over

24   Mr. Feng?

25   A    No, I wasn't.

1    Q    When you arrived at Mr. Feng's cars, was it already

2    pulled over?

3    A    Yes.

4    Q    So you went from the area somewhat near the storage

5    facility to a car that had already been pulled over, correct?

6    A    Correct.

7    Q    So based on your own observation, you did not see what

8    happened when the car was itself pulled over?

9    A    Not initially, no.

10   Q    You did not see how the driver, Mr. Feng, was operating

11   the vehicle at the time it was pulled over, correct?

12   A    Correct.

13   Q    And there were at least several vehicles in between

14   Mr. Feng's car and yours, as far as you know, at the time that

15   it was pulled over?

16   A    Correct.

17   Q    When you were diving, you said that you were driving

18   alone in your car, right?

19   A    Yes.

20   Q    And each of the investigating officers were each in their

21   own car?

22   A    Yes.

23   Q    You said you were communicating with each other over the

24   DEA radio?

25   A    Yes.

1    Q    And that radio is not recorded, right?

2    A    That I know of.

3    Q    It's a point-to-point radio?

4    A    Point-to-point.

5    Q    The car you were traveling in, it's not equipped with a

6    dashboard camera that's always running, right?

7    A    No, ma'am.

8    Q    You were not wearing a body-worn camera, right?

9    A    No, ma'am.

10   Q    You did not gather any surveillance video from area

11   businesses or traffic cameras, correct?

12   A    Not that I'm aware of.

13   Q    You did not do that?

14   A    No.  Not me personally.

15   Q    So when you arrived, you said Mr. Feng had already been

16   pulled over, right?

17   A    Yes.

18   Q    You did not issue him any traffic tickets or any kind of

19   summons, right?

20   A    That I'm aware of, I don't know that any tickets were

21   issued.

22   Q    At the time when you parked your car, were the other

23   agents already out of their cars?

24   A    They were.

25   Q    And were they already standing beside Mr. Feng's car?

1    A    They were.

2    Q    Where did you see the other officers and who did you see?

3    A    They were on the driver's side of the vehicle.  I believe

4    I saw Special Agent Farquharson, and Special Agent Callahan.

5    Q    Is it fair to say you were the third officer to arrive at

6    the scene?

7    A    Yes.

8    Q    And you arrived at the passenger side, right?

9    A    I did.

10   Q    At the time when you arrived with the other two officers,

11   that's when you personally heard Mr. Feng state "No English",

12   right?

13   A    He was talking to the agent on the driver's side, I was

14   on the passenger's side.  I'm -- I think that's what was being

15   said.

16   Q    You think that you heard him say to the officer, one of

17   the officers at least on the driver's side, "No English",

18   right?

19   A    I believe that's what he was saying.

20   Q    And you also believe that you heard Mr. Feng say to those

21   agents who stopped him, quote, "Just a taxi", right?

22   A    Yes.

23   Q    You told us that at the time that you first encountered

24   him, you were not able to communicate with him in English,

25   right?

1    A     Yes.

2    Q     You did ask him to get out of the car in English,

3    correct?

4    A     He was asked to come out, yes.

5    Q     And he did get out of the car?

6    A     Yes, he complied.

7    Q     When he got out of the car, I think you described on

8    direct examinations what you were doing with him, as quote, "a

9    sign language type of thing", right?

10   A     Yes.

11   Q     So you were basically gesturing for him to get out of the

12   car?

13   A     Correct.

14   Q     And he, when you did that, did get out of the car?

15   A     He did.

16   Q     And then you pointed at the car, right?

17   A     What do you mean by "point at the car"?

18   Q     Once he was out of the car, using your sign language, you

19   pointed at the car, right?

20   A     Yes, he was asked to come out of the vehicle, come out of

21   the vehicle.

22   Q     And after he was already out of the vehicle, did you

23   point at the car?

24   A     I don't recall, but he was told to come over to the side

25   so that he wouldn't get hit by a car.

1      THE COURT:  I'm sorry, could I have the court

2  reporter read at that last answer, I couldn't hear it.

3      (Whereupon, the record was read.)

4      THE COURT:  Thank you.

5  BY MS. EISNER-GRYNBERG:

6  Q    After you told him to come -- to not get hit by the car,

7  that's when you decided that you wanted to search the car,

8  right?

9  A    No.  We engaged in conversation with him, tried to talk

10 to him.  He was patted down.  Make sure he didn't have any

11 weapons.

12      The search of the vehicle didn't come until we

13 actually established that he could speak Spanish, and he was

14 asked.

15 Q    So let me back you up on that.

16      At the time when you stopped the car, you did not

17 know that the driver was the person who spoke any Spanish,

18 right?

19 A    I'm not going to say that.  I don't go up to -- I came up

20 to the passenger side.

21      And I'm going to tell you, I never go thinking that

22 some person can't speak English, or can't speak any language,

23 because then I would be pretty much judging a book by its

24 cover.

25 Q    What I'm asking you is, in the course of your

1    investigation, you didn't form any intelligence that you would

2    be approaching a Spanish-speaking Chinese man, right?

3    A    I didn't know.  And honestly I didn't know.

4            And just from my -- just to let you know my

5    experience, coming from where I come, there are Chinese people

6    in the Dominican Republic and Cuba --

7    Q    That's not what I'm asking you.

8    A    -- so you know where my mindset is at.

9    Q    When you approached him, the first language you attempted

10   to engage him with was English, right?

11   A    Well, I didn't approach him first, it was the agents that

12   approached him first.

13   Q    And they spoke to him first in English, right?

14   A    Right.

15   Q    And then when you approached him, you also spoke to him

16   in English, right?

17   A    I tried to.  Yes, I tried to.

18   Q    And what you told us is that it was actually him who

19   first informed you guys that he spoke Spanish, right?

20   A    Uh-huh.

21   Q    Is that right?

22   A    Uh-huh, yes.

23   Q    Isn't it true that the conversation you had with Mr. Feng

24   in Spanish only happened after you searched the car?

25   A    No, I don't recall that.  I'm sorry.

1          I recall it being prior to that.

2    Q    Okay.  Would you agree with me that there were three

3    officers on the motor vehicle stop?

4    A    Initially, yes.

5    Q    The three officers on the motor vehicle stop were

6    yourself, Officer Callahan, and Officer Farquharson, right?

7    A    Correct.

8    Q    Officer Callahan does not speak Spanish, correct?

9    A    No.

10   Q    And Officer Farquharson does not speak Spanish, correct?

11   A    No.

12   Q    When it was yourself, and Officer Callahan, and

13   Officer Farquharson, at the vehicle stop, that was the time in

14   which the vehicle was searched; isn't that right?

15   A    No.  The vehicle was not searched until we had spoke with

16   him.  And, again, the conversation came about when another

17   colleague had come up and spoke to me in Spanish prior to the

18   search.

19   Q    It's your testimony that a fourth officer came on to the

20   scene and spoke with you and then you spoke with Mr. Feng in

21   Spanish before the search.  Is that your testimony?

22   A    Yes.

23          MS. EISNER-GRYNBERG:  I'm going to direct your

24   attention to some notes that were taken on February 9th of

25   2021.  This is marked for identification as 3500-EH-2.  And

HERRERA – CROSS – EISNER-GRYNBERG                50

1    I'm on the second page.

2              Can I use the ELMO, please?

3              THE COURTROOM DEPUTY:  Yes.

4              (Exhibit published.)

5    Q    I'll show you the first page first.

6              This is what's called a DEA report of investigation;

7    is that right?

8    A    Yes.

9    Q    And this is something that you're familiar with in the

10   task force, it's just a way that officers document reports,

11   right?

12   A    Uh-huh.

13   Q    You can see from this report that this was written on

14   February 9th, 2021 by Officer Alejandro Delgado, correct?

15   A    Correct.

16   Q    And that was -- that it recounts a conversation by WebEx

17   between yourself and the prosecutor, AUSA Andrew Wang; is that

18   right?

19   A    Yes.  I can barely see it.  I'm having trouble focusing

20   on it.

21             MR. WANG:  Your Honor, may I give the witness a hard

22   copy?

23             THE COURT:  I assume there is no objection if the

24   government gives the witness a hard copy?

25             MS. EISNER-GRYNBERG:  No, that would be great.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1          THE COURT:  It is, I will say, that from my screen

2     it's also very blurry.

3          MR. WANG:  (Proffering.)

4          THE WITNESS:  What line are you looking at?

5     Q    I'm in paragraph 3.

6          Paragraph 3 recounts that you were asked to explain

7     your involvement in the motor vehicle stop on October 29th,

8     2019; is that right?

9     A    Yes.

10    Q    And that you began by stating that prior to the stop, you

11    were part of a larger team conducting surveillance on a

12    self-storage facility, correct?

13    A    Correct.

14    Q    And that each member of the surveillance team was driving

15    their own vehicle?

16    A    Right.

17    Q    The Toyota Sienna --

18         MR. WANG:  Your Honor, objection to this line of

19    questioning.  This is not the witness' report.

20         THE COURT:  I'll allow it.

21    BY MS. EISNER-GRYNBERG:

22    Q    Binbu Feng was observed leaving the facility and a stop

23    was initiated after observing a traffic violation, correct?

24         It then says:  Task Force Officer Eladio Herrera,

25    Task Force Officer Ricardo Farquharson, and Special Agent

HERRERA - CROSS - EISNER-GRYNBERG                    52

1    Thomas Callahan were the officers at the stop.

2              Did I read that correctly?

3    A    Yes.

4    Q    I'm now going to turn your attention to some notes that

5    are labeled 3500-EH-3.

6              These are notes I believe were written by AUSA Wang

7    when he was talking to you in preparation for this hearing.

8              And I'll draw your attention to the center of the

9    page.

10             Am I reading this correctly:  Callahan, Rick,

11   Eladio --

12             MR. WANG:  Your Honor, objection.  Incorrect

13   characterization of these notes.

14             MS. EISNER-GRYNBERG:  These are notes written by

15   somebody of a conversation in preparation for this hearing.

16   Q    Do these sound like -- does this sound like a

17   conversation you had in recent weeks?

18   A    I don't -- I don't know.

19   Q    Okay, I'll show you the first page.

20             On the top of this page, 3500-EH-3, it says:

21   "Herrera supression interview prep."

22             You are Herrera, right?

23   A    Yes, I am.

24   Q    It says:  "Investigator, New York State Police,

25   27-and-a-half years."

HERRERA – CROSS – EISNER-GRYNBERG                53

1          That's you, right?

2   A    Yes.  Yes.

3   Q    And what it says in those notes is that:  "Callahan,

4   Rick, and Eladio were the officers on the M/V stop", right?

5   A    Yes.

6   Q    Exactly as it was in the previous --

7   A    Uh-huh.  Uh-huh.

8   Q    Now, on direct examination, you told us that Mr. Feng

9   gave you consent to search his vehicle by using what you

10  called "body language," right?

11  A    I also asked him.  I asked him if we can look, and he

12  said, "Sí."

13  Q    And you said that his body language is what changed when

14  you say you were speaking to him in Spanish rather than

15  English, right?

16  A    Yeah, I think he felt comfortable with that.

17  Q    Okay.  Now you've been a police officer for 27-and-a-half

18  years, right?  So you know that it's important that when

19  you're saying that you had consent to search a vehicle, it's

20  important to know that the person you're speaking with knows

21  what they're doing, right?

22  A    Yes.

23  Q    That the person is making a voluntary choice.

24  A    Yes.

25  Q    And that they're giving you clear consent to search the

1    vehicle, right?

2    A    Yes.

3    Q    You did not get written consent from Mr. Feng.

4    A    I didn't.

5    Q    You did not seek written consent from Mr. Feng.

6    A    I can't say -- I didn't, but I don't know if anybody else

7    did.

8    Q    Well, you're not aware --

9    A    I'm not aware.

10   Q    -- another agent having gotten that, right?

11        You said that later back at the DEA office, Mr. Feng

12   was *Mirandized*, right?

13   A    That's right.

14   Q    You said that he did not invoke his right to counsel.

15   A    That I recall.

16   Q    So once he was back at the office, you did not, after his

17   *Miranda* warnings were given to him, confirm from him that he

18   had consented to search of the vehicle?

19   A    We actually didn't even talk about the vehicle.  We

20   talked about other stuff.

21   Q    So you did not confirm that he had consented to the

22   search of the vehicle?

23   A    No, I didn't.

24   Q    At the time when you were back out at the vehicle, you

25   did not tell him that he did not have to let you search the

1   vehicle?

2   A     No, I didn't.

3   Q     You also didn't ask him specifically about searching any

4   packages within the vehicle?

5   A     No, I didn't.  I didn't.

6   Q     Okay.  So let's go back to at the time when you're first

7   approaching the minivan, okay?

8         You said that when you parked the car, it had

9   already been pulled over, correct?

10  A     Yes.

11  Q     And that you began to walk towards it?

12  A     Correct.

13  Q     It's fair to say that you did not smell any marijuana

14  before you got to the car itself, right?

15  A     Correct.

16  Q     You said that you did not smell it until your head was

17  already inside of the vehicle, right?

18  A     Correct.

19  Q     When you poked your nose inside?

20  A     Yes.

21  Q     When you got to the vehicle -- withdrawn.

22        You're aware that if you smell marijuana in a

23  vehicle, you're allowed to search that vehicle, right?

24  A     Right.

25  Q     When you tell us that you smelled it, though, you did not

1    immediately go search the vehicle?

2    A    No.

3    Q    What you did is you took Mr. Feng outside of -- out of

4    the car, right?

5    A    Correct.

6    Q    And you tell us that you engage in some kind of back and

7    forth with him.

8    A    Correct.

9    Q    Eventually when you went to the back, you showed us that

10   you found marijuana in the trunk of the car, right?

11   A    Yes.

12         MS. EISNER-GRYNBERG:  I'm showing you what's in

13   evidence as Government Exhibit 1.

14         (Exhibit published.)

15         THE WITNESS:  Yes.

16   Q    It's fair to say that the marijuana that you found was

17   wrapped in what's commonly known as contractor bags, right?

18   A    Yes.

19   Q    And contractor bags are thick plastic -- black plastic

20   garbage bags, right?

21   A    Yes.

22   Q    So you can see from this photograph, in Government

23   Exhibit 1, that those bags, the garbage bags, were closed,

24   right?

25   A    Yes.

1      MS. EISNER-GRYNBERG:  I'm showing you what's been

2  marked for identification as Government Exhibit 3.

3      (Exhibit published.)

4  Q    This photograph was not previously shown to you on direct

5  examination, right?

6  A    No.

7  Q    You've seen this photograph before, right?

8  A    I think they're part of a file.  Yeah, I think they're

9  part of a file, but...

10  Q    More importantly, on October 28th, 2019, you, back at the

11  office, did see what came out of the black contractor bags,

12  right?

13  A    I did not see it come out because I was busy doing other

14  things.

15  Q    I'm not saying you saw it --

16  A    I saw it at the scene.  I saw it at the scene.

17  Q    So this photograph accurately depicts the manner in which

18  the marijuana was packaged, right?

19  A    It appears.

20  Q    And that's how -- it was in those kind of vacuum-sealed

21  plastic sheets, right?

22  A    Correct.

23  Q    And those sheets were what was inside of the garbage

24  bags?

25  A    Those sealed packages was what was in the bags.

HERRERA – CROSS – EISNER-GRYNBERG          58

1    Q    And that's a fair and accurate depiction of what the

2    contents were inside of the garbage bags?

3    A    Correct.

4         MS. EISNER-GRYNBERG:  Your Honor, I move to admit

5    what was previously marked as Government Exhibit 3 as Defense

6    Exhibit A.

7         MR. WANG:  No objection.

8         THE COURT:  Received.

9         (Defense Exhibit A, was received in evidence.)

10   BY MS. EISNER-GRYNBERG:

11   Q    I'm going to bring your attention back to Government

12   Exhibit 1 and put it next to Defense Exhibit A.

13        If you look at Government Exhibit 1, it looks like

14   what's -- the contents of the garbage bags are essentially in

15   a cubed-shaped stack, right?

16   A    Correct.

17   Q    If we go back to Defense Exhibit A, it appears that the

18   way the marijuana was packaged was in several sheets of

19   vacuumed-sealed plastic stacked on top of one another.

20   A    If I may.

21   Q    Yes.

22   A    I see where you're going with this.  However, we don't

23   know if any of these bags were compromised or not.

24        The seal usually lasts for so long.  And this was in

25   a storage unit.  We don't know how long it was in the storage

1   unit.  So we don't if any this was compromised, but I do know

2   what I smelled.

3   Q    Well, what I'm asking you is what you saw.

4   A    Right.

5   Q    And what you see in this image, was that at the time the

6   bags are back at the DEA headquarters, they still appeared to

7   come out of the garbage bags in vacuumed-sealed sheets; is

8   that right?

9   A    It appears that way.

10          MS. EISNER-GRYNBERG:  I have nothing further at this

11   time.

12          MR. WANG:  One moment, Your Honor.

13          (Pause in the proceedings.)

14          MR. WANG:  Short redirect, Your Honor.

15          THE COURT:  All right.

16   REDIRECT EXAMINATION

17   BY MR. WANG:

18   Q    Investigator, I believe you testified earlier that there

19   were multiple individuals on the surveillance team on

20   October 28th, 2019, correct?

21   A    Yes.

22   Q    Can you describe again, approximately how many

23   individuals were involved in that surveillance?

24   A    Like I said, anywhere from eight to ten.

25   Q    Had you worked with those other agents before?

HERRERA – REDIRECT – WANG                    60

1    A    Yes.

2    Q    Did you have an active professional relationship with

3    them?

4    A    Yes.

5    Q    In the course of your law enforcement duties and working

6    with those individuals, did you trust their professional

7    judgment?

8    A    Yes.

9    Q    Did you keep the eye, as you said before, on the loading

10   dock for the entire time of the surveillance?

11   A    No.

12   Q    Can you tell us again why it was that you changed

13   positions during the surveillance?

14   A    Again, it's just common practice so that the surveillance

15   does not get compromised.

16   Q    And is that, in your experience, something that's usually

17   done during other surveillance assignment?

18   A    Yes.

19   Q    And I believe you said before that there was regular

20   radio contact with other members of the team?

21   A    Correct.

22   Q    At any point during the surveillance, did there appear to

23   be any problems with the ability to communicate by radio?

24   A    No.

25   Q    Did the rhythm or nature of updates over the radio change

1    in any unusual way, to your memory?

2    A     No.

3    Q     Investigator, by the time you pulled over the car, can

4    you tell us again who it was that had pulled over the Sienna?

5    A     Special Agent Callahan initially, and Special Agent

6    Farquharson.

7    Q     Can you tell us again at what point during this

8    interaction you asked the defendant in Spanish if you could

9    look inside the car?

10   A     Once we were on the side of the car and had realized that

11   he spoke the language, and he was asked.

12   Q     Relative to the search of the car, when did you ask that

13   question?

14   A     Prior to opening the back of the door.

15   Q     The exhibits that defense counsel showed you before, the

16   3500-EH-2, did you write that report?

17   A     I did not.

18   Q     But you recall the discussion that's described in that

19   report?

20   A     Yes.

21   Q     You mentioned before on direct and on cross that there

22   was a fourth team member of the surveillance team that arrived

23   on the scene, correct?

24   A     Correct.

25   Q     Did that fourth individual personally participate in the

1    car stop?

2    A    He did not.

3    Q    Did he personally participate in the arrest?

4    A    He did not.  He was there, but he did not.  He just came

5    and checked up on us.

6    Q    So when you describe which officers are on a stop, which

7    individuals would you include in that description?

8    A    Myself, Farquharson, and Callahan.

9    Q    Is that because those are the three individuals

10   personally involved in the stop and arrest?

11   A    Yes.

12   Q    Investigator, have you testified in court at hearings and

13   trials previously?

14   A    I have.

15   Q    And in the course of preparing for that sort of

16   testimony, have you prepared with government attorneys?

17   A    I have.

18   Q    In your experience, when preparing for testimony for a

19   hearing or trial, is every single detail of a subject matter

20   discussed during those preparations?

21   A    No.

22   Q    Investigator, you said before that you believed that you

23   had consent to search the car.

24   A    Correct.

25   Q    Tell us again what led you to believe that you had

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    consent from the defendant to search the car?

2    A    Simply asking him if we can take a look and see what was

3    in the vehicle and him saying yes.

4    Q    You also said that you believed that you had probable

5    cause to search the car --

6    A    Correct.

7    Q    Why did you ask for consent if you already had probable

8    cause?

9    A    As a courtesy.  As, you know, just trying to do things

10   the right way, and giving him the benefit of the doubt and

11   engaging with him.

12   Q    In your experience, when there is reason to search a car,

13   even when probable cause already exists in other instances,

14   did you typically also ask for consent?

15   A    It all depends on the individual, but -- it all depends

16   on the individual case.  It's all contingent on the individual

17   case.

18   Q    And in terms of the probable cause that you believe you

19   had at the time of the search, was the basis of that belief in

20   part informed by the information you received from the agents

21   who had the eye on the dock?

22   A    Yes.

23   Q    And is that typical practice to rely on information

24   passed along to you from other members of the surveillance

25   team?

1    A    Yes.  Yes.

2    Q    Investigator, you already saw in Defense Exhibit A that

3    the bags here were tightly sealed, correct?

4    A    Right.

5    Q    In your experience, is that sort of packaging common by

6    drug traffickers to conceal smell and things like that?

7    A    Yes.

8    Q    But does that concealing always conceal the smell of

9    packaged narcotics?

10   A    No.

11   Q    In this particular case, did the vacuum sealing conceal

12   the smell of the narcotics?

13   A    No.

14             MR. WANG:  Thank you.  No further questions.

15             THE COURT:  Anything else?

16             MS. EISNER-GRYNBERG:  No.  Thank you.

17             THE COURT:  All right.

18             Thank you very much.  You may step down.

19             (The witness was excused.)

20             MR. WANG:  One moment, Your Honor.

21             (Pause in the proceedings.)

22             MR. WANG:  Your Honor, no further witnesses.

23             THE COURT:  All right.

24             Does the defense have any evidence to present?

25             MS. EISNER-GRYNBERG:  May we have a brief recess so

PROCEEDINGS                                    65

1    that I can consult with Mr. Feng whether he wishes to testify?

2            THE COURT:  All right.  How much time would you

3    like?

4            MS. EISNER-GRYNBERG:  Five minutes.

5            THE COURT:  All right, we'll resume at quarter to

6    12.

7            MS. EISNER-GRYNBERG:  Thank you.

8            (A recess was taken at 11:38 a.m.)

9            THE COURT:  Is everyone ready?

10           MS. EISNER-GRYNBERG:  Yes, Your Honor.

11           MR. WANG:  Yes, Your Honor.

12           THE COURT:  Do you want the recall the case?

13           THE COURTROOM DEPUTY:  Sure.

14           Criminal cause for a supression hearing, United

15   States versus Binbu Feng, Docket Number 19-CR-557.

16           THE COURT:  Did counsel want to state their

17   appearance for the record?

18           MR. WANG:  Yes, Your Honor.  For the United States,

19   Andrew Wang and Mark Bini.

20           MS. EISNER-GRYNBERG:  Federal Defenders by Mia

21   Eisner-Grynberg for Binbu Feng, with a Cantonese interpreter.

22           THE COURT:  All right.  And the Cantonese

23   interpreters are both here, as well as Mr. Feng.

24           I understand that the defense is going to be calling

25   a witness, that Mr. Feng will be testifying on his own behalf.

FENG - DIRECT - EISNER-GRYNBERG                66

1           MS. EISNER-GRYNBERG:  Yes.  The defense calls Binbu

2    Feng.

3           THE COURT:  All right, if he could please have a

4    seat in the same witness seat that we've been using.

5           And I'll ask Government counsel:  Mr. Wang, do you

6    want the defendant to remove his mask during his testimony?

7           MR. WANG:  Yes, Your Honor.

8           THE INTERPRETER:  Okay.

9           THE COURT:  Mr. Feng, would you please rise.

10           THE COURTROOM DEPUTY:  Please raise your right hand

11    to be sworn.

12           (Witness takes the witness stand.)

13    **BINBU FENG**, called as a witness, having been first duly

14    sworn/affirmed, was examined and testified as follows:

15           THE WITNESS:  I do.

16           THE COURTROOM DEPUTY:  Please state your name for

17    the record.

18           THE WITNESS:  Binbu Feng.

19           (Discussion was had off the record.)

20    DIRECT EXAMINATION

21    BY MS. EISNER-GRYNBERG:

22    Q    Good morning, Mr. Feng.

23    A    Good morning, everyone.

24           (Discussion was had off the record.)

25    BY MS. EISNER-GRYNBERG:

1    Q    Mr. Feng, what do you do for work?

2    A    You mean now or before?

3    Q    Yes, now.

4    A    I'm a chef.

5    Q    And what were you doing for work in October of 2019.

6    A    I do recycling of metals.

7    Q    And was there a time in October of 2019 when you were

8    doing deliveries of items?

9              MR. WANG:  Objection.  Leading.

10             THE COURT:  I'll allow it.

11   A    In July I was still doing metal recycling.  And then

12   afterwards then I injured my leg, so I stopped, you know, for

13   some time.  And then afterwards I did for about two to three

14   weeks on air conditioning work.

15             THE INTERPRETER:  The witness asks the interpreter.

16   A    After my leg healed, then I follow my friend, and then I

17   do this about two to three in air conditioning work.

18   Q    And did you ever do work in what you would call "being a

19   taxi"?

20             THE INTERPRETER:  Taxi?

21             MS. EISNER-GRYNBERG:  Yes, T-A-X-I.

22             THE INTERPRETER:  Okay.

23   A    So after a while of working on the air conditioning work,

24   I couldn't bear it any more, so my family suggested that I

25   bought a car to do a taxi business.

1  Q    And when did you the taxi business, were you driving

2  around people or items?

3  A    Sometimes when I have friends who wants to go out at some

4  time, I need to drive them, and I will drive them.  Or if they

5  have other people that needs my help, and sometimes I would

6  also do a little bit of delivery work as well.

7  Q    Okay.  Mr. Feng, what is your -- what language do you

8  speak?

9  A    In here I usually speak Cantonese.

10  Q    Are you fluent in English, sir?

11  A    Basically I don't know a single word in English.

12  Q    Are you fluent in Spanish?

13  A    Not fluent in Spanish at all.  I just understand a little

14  bit of the conversational Spanish.

15  Q    Okay.  I want to bring you back to the day that you got

16  arrested October 28, 2019.

17          Do you remember that day?  Do you remember that day?

18  A    All I knew is that, you know, I was driving some things,

19  and then when I was on the expressway, I got stopped by some

20  police cars.  That's what happened.

21  Q    Yes.  That's what I want to ask you about, okay?

22          At the time when the police pulled you over, was the

23  person, the police officer who pulled you over, the man who

24  just testified?

25  A    No.  I remember the first person that stopped my vehicle

1    was a bald-headed guy, not the witness -- not the witness

2    here.

3    Q    The bald-headed guy, what language did he speak to you

4    in?

5    A    He used English.

6    Q    And when he spoke to you in English, did you understand

7    what he was saying?

8    A    No.  No.  No.  I didn't understand what he was saying in

9    English, no.

10   Q    At some point, did the officer who testified, come to the

11   side of your car?

12   A    I don't recall clearly.

13   Q    Do you recall any of the officers, who were at the side

14   of the road with your car, speaking any language other than

15   English at the side of the road?

16   A    At that time, there couple cops over there, and I

17   remember it was mainly it was the bald-headed cop who spoke to

18   me.

19   Q    Did he speak -- did the cops speak in English?

20   A    Yes.

21   Q    Did any police officer ever speak to you in Chinese?

22   A    No.

23   Q    Did any of the police officers, while you were at the car

24   on the expressway, ever speak to you there on the street in

25   Spanish?

1   A    No.

2   Q    Did you communicate to the officers on the street that

3   you did not speak English?

4   A    Yeah, I said, "I don't know English."

5   Q    And did you -- do you remember saying any other words to

6   them?

7   A    I used hand motion to show them that -- I used hand

8   motion to show them taxi, taxi.

9   Q    At some point did you get out of your car?

10  A    Yes, I did.

11  Q    And why did you get out of your car?

12  A    Because he told me to get out of the vehicle.

13  Q    And how did you understand that?

14  A    Because normally when the cops want to check a vehicle,

15  they will tell the driver to get out.

16  Q    When you got out of the car, did you understand that you

17  had a right to tell them they can search the car or they

18  cannot?

19  A    I entirely did not know that I have such rights.

20  Q    At the time when the officers began to search your car,

21  did they ever say one word to you in Spanish?

22  A    No.

23  Q    Did you say one word to them in Spanish at the car?

24  A    No.

25  Q    When is the first time, if at all, that you remember

FENG - CROSS - WANG                                71

1    conversing in Spanish with Investigator Herrera?

2    A     When I was arrested and was brought back to the office to

3    have my statement taken in the office.

4    Q     So that was after your car was searched by the police?

5    A     Yes.  Correct.

6              By then I was already brought back to the office.

7              MS. EISNER-GRYNBERG:  Thank you, I have nothing

8    else.

9              THE COURT:  Mr. Wang, your witness.

10             MR. WANG:  Yes, Your Honor.

11   CROSS-EXAMINATION

12   BY MR. WANG:

13   Q     Good afternoon.

14   A     Good afternoon.

15   Q     Mr. Feng, on direct examination you said that at a

16   certain point you started working as a taxi to deliver items,

17   correct?

18   A     Yes.

19   Q     What sort of items did you deliver as a taxi?

20   A     Whatever -- whatever order that other people told me, you

21   know, to do for delivery, and I just do whatever he told me.

22   Q     How would you receive orders to deliver items in the

23   first place?

24   A     There are ways that amongst the Chinese communities that

25   they can messaging each other.

1    Q    On October 28th, 2019, after your car was stopped, two

2    large bags of marijuana were found in your vehicle, right?

3    A    Yes.

4    Q    Is it your testimony here today that before that stop,

5    you had no idea what was in those bags?

6            MS. EISNER-GRYNBERG:  Objection.  Beyond the scope

7    of the testimony.

8            THE COURT:  I'll allow it.

9    A    Correct.

10   BY MR. WANG:

11   Q    Mr. Feng, you submitted a sworn declaration in support of

12   your motion to suppress, right?

13   A    Yes.

14   Q    And you signed and help prepare that affidavit with the

15   help of your attorney, right?

16   A    Yes.

17   Q    And when you signed that affidavit, you understood that

18   you were swearing to its truth, basically being under oath

19   like you are today, right?

20   A    Yes, I understand that.

21           THE COURT:  Just to clarify the record.  The

22   declaration itself says that Mr. Feng authorized counsel to

23   sign electronically on his behalf.

24           MR. WANG:  Thank you, Your Honor.

25   BY MR. WANG:

1   Q     And in that declaration, you stated that you speak some

2   Spanish, correct?

3   A     Yes.

4   Q     And on direct examination you testified that you speak

5   conversational Spanish, right?

6   A     Yes.

7   Q     And you spoke with Investigator Herrera after your arrest

8   at the DEA headquarters, right?

9   A     Yes.  The one that just testified earlier.

10  Q     And during that conversation with Investigator Herrera,

11  you spoke with him about your personal background, right?

12  A     Yes.

13  Q     And when you spoke with him at DEA, you spoke with him in

14  Spanish, right?

15  A     So there was no interpreter at that time, so that's why

16  he was conversing in Spanish.

17  Q     But for the record, you were speaking with

18  Investigator Herrera in Spanish, right?

19  A     Yes.

20  Q     When you described your personal background to

21  Investigator Herrera, you told him that you spent several

22  years living in Venezuela, right?

23  A     Yes.

24  Q     Venezuela is a Spanish-speaking country, right?

25  A     Correct.

1    Q    And when you were at the DEA office, you also helped to

2    interpret Chinese into Spanish for another person that was

3    arrested that day, right?

4    A    Yes, I helped them out; yes.

5    Q    So you were able to have a conversation with officer --

6    with Investigator Herrera and also interpret for another

7    person at the DEA office, right?

8    A    It's not that I have the ability to do that, just that at

9    that time the other Chinese defendant didn't know what they

10   were telling him to do.  So then the agent was asking me to

11   help out to tell them what they're supposed to do.  So I just

12   helped out.

13   Q    Sir, my question was:  You were able to have a

14   conversation with Investigator Herrera in Spanish, right?

15   A    Yes.

16   Q    And you were able to understand each other during that

17   conversation in Spanish, right?

18   A    Normal daily conversation I will understand.

19   Q    I'm going to go back to the car stop for a moment.

20        On direct examination, you testified that you exited

21   the car at some point, right?

22   A    Yes.

23   Q    And you got out of the car at the direction of officers,

24   right?

25   A    Yes.

FENG – CROSS – WANG                    75

1    Q    And when they asked you to get out of the car, they asked

2    you to do that in English, right?

3    A    Yes.

4    Q    So you understand at least some English, right?

5    A    No.  No.  No.  It's not that -- it's not that I

6    understood any English, it was because they were using hand

7    motion to gesture me at that time.

8    Q    So it's your testimony today that the only reason why you

9    got out of the car was because officers were hand gesturing

10   you to get out?

11   A    Yes.

12   Q    You testified on direct that one of the reasons why you

13   got out of the car was because you understood the officers

14   wanted to search the car; isn't that right?

15   A    When?

16   Q    On direct examination, I believe, and we may might ask

17   for a read-back, but on direct examination, I believe you

18   testified that when you got out of the car, you understood

19   that the officers wanted to look inside the car.

20   A    What?  What about whether I understood or not?

21   Q    Sir, I'm asking you if during your direct examination,

22   your direct testimony, you said that one of the reasons why

23   you got out of the car was because you knew the officers

24   wanted to search it.

25   A    Yes.

1    Q    So by the time you get out of the car, you are at least

2    aware that the officers want to search the car, right?

3    A    I didn't understand whether they were going to search my

4    car or not.

5    Q    But it was your belief that you knew that they wanted to

6    search the car at that time, right?

7    A    I don't know.  I didn't know.

8    Q    You said that at one point an officer pointed to the car

9    and said something to you, right?

10   A    Yes.

11   Q    And I believe you said in your affidavit that in response

12   to that you said "Yes", right?

13   A    Yes.

14   Q    Sir, when you picked up those bags that day, how did you

15   get them?

16   A    I went to the -- I went to a specified location to pick

17   them up.

18   Q    And when you got to that specified location, that was a

19   loading dock for a warehouse facility of some sort, right?

20   A    Yes.

21   Q    There were several other individuals there helping to

22   load items into cars at that time, right?

23   A    I don't recall clearly.

24   Q    Mr. Feng, you got out of your car to help load items into

25   your car, right?

1    A    My memory of it, it was very blurry.  So I don't recall

2    exactly how it was at that time.

3              MR. WANG:  Well, Mr. Feng, in your sworn

4    declaration, in paragraph --

5              Yes, I'm going to put up for the witness his sworn

6    declaration.  This is the first page, and here's the second

7    page.

8              And this is written in English, of course.  And I'll

9    read to you what it says in the fifth paragraph.

10             It says here that:  "I did not get out of the van."

11   And that was when you arrived at the location.

12             It says:  "When I arrived at the location, I opened

13   the trunk of my minivan."

14             And then it says:  "I did not get out of the van."

15   Q    Having seen your previous sworn declaration, does that

16   refresh your memory of whether or not you got out of the car

17   on October 28th, 2019?

18   A    Maybe I have, but when I was -- when my statement was

19   taken, you know, I was very confused and nervous, so maybe I

20   misspoke.

21   Q    But you would agree with me that in this sworn document,

22   you wrote that you did not get out of the van.

23   A    Maybe I misspoke.

24             MR. WANG:  Mr. Feng, I'm going to show you what in

25   evidence, Government Exhibit 4.

1          (Exhibit published.)

2    Q    Mr. Feng, that's you on the loading dock; isn't it?

3    A    Yes.  Yes.  That's me, yes.

4    Q    And that's your Toyota Sienna?

5    A    Yes.

6    Q    So on October 28th, 2019, you helped load the black bags

7    into your car, right?

8    A    No.  I was not the one to unload the bags.  No.

9    Q    Mr. Feng, do you see on Government Exhibit 4 a yellow

10   cart of some sort?

11   A    Yes, I see it.

12   Q    So you would agree with me that the yellow cart appears

13   to contain a black item of some sort, right?

14   A    Yes, I see it.

15   Q    And that's positioned directly behind your Toyota Sienna,

16   right?

17   A    I don't understand what you mean.

18   Q    The black item in the yellow cart is directly behind your

19   car, right?

20   A    Are you asking -- are you asking me whether it was in my

21   car, or whether it was outside of my car, or what?

22   Q    Sir, my question is:  In this photograph, would you agree

23   with me that the yellow cart is outside but directly behind

24   your vehicle?

25   A    Yes.

1    Q    And you're standing next to that yellow cart, right?

2    A    Yes.

3    Q    You see at least two other adult males standing close to

4    you in this picture in Government Exhibit 4, right?

5    A    Yes.

6    Q    And those are the men who handed you the objects to load

7    in your car, right?

8    A    Yes.

9    Q    You spoke with those men when you were loading the items,

10   right?

11   A    Because they came out and so I -- so I told them to put

12   the bags into my vehicle.

13   Q    So you spoke with them, right?

14   A    No, no, at that time I was actually speaking on the

15   phone.  I was speaking on the phone at that time, not to them.

16   Q    Mr. Feng, is it your testimony today that at no point did

17   you exchange words with the men in this photograph?

18   A    So, so, I think, I think, I think I just said that I

19   arrived and -- and they could just put whatever, and then I

20   can deliver.

21   Q    And is it your testimony that you had no information as

22   to what was inside those bags?

23   A    No idea.

24   Q    You could not smell any usual odor coming from those

25   bags?

1   A     No, I didn't smell it.

2   Q     Mr. Feng, are you familiar with the odor of marijuana?

3   A     No, I'm not familiar with it.

4   Q     You have never personally encountered marijuana in a way

5   where you could smell marijuana?

6   A     I never tried it, no.

7   Q     That wasn't my question.  My question was:  Are you

8   saying you have never been close enough to marijuana to

9   recognize its smell?

10  A     I've never touched any marijuana.

11  Q     I think you had said earlier before that at no point did

12  you handle these bags, correct?

13  A     No, I didn't.

14  Q     Is it your testimony that you arrived at this location,

15  you got out of the car, you stood next to the bags inside this

16  yellow cart, and you never touched it?

17  A     No, I didn't.  Yes.

18  Q     Mr. Feng --

19            THE INTERPRETER:  Excuse me.  He hasn't finished

20  yet.

21  A     Basically I just ask that, you know, in such a way that I

22  ask as an ordinary worker, and I indicated that I arrived, and

23  I would indicate to my client that they could unload the

24  merchandise into my vehicle, and when the merchandise was not

25  heavy, I would not be involved to touch it.

FENG – CROSS – WANG                              81

1    Q    Mr. Feng, you saw Defense Exhibit A earlier, right?

2    A    Yes.  Yes.

3    Q    That was the photograph of the marijuana seized from your

4    vehicle, right?

5              (Exhibit published.)

6    A    I didn't know.

7    Q    I'm asking you:  Is this a photograph of the marijuana

8    that was taken from your vehicle?

9    A    I don't know.

10   Q    You would agree with me that in Defense Exhibit A, that

11   seems like a substantial quantity of marijuana, right?

12   A    I don't know.

13   Q    You saw Government Exhibit 1 earlier, right?

14             This photograph?

15             (Exhibit published.)

16   A    Yes.

17   Q    That's the back of your car, right?

18   A    Yes.

19   Q    And those two black plastic bags fill almost the entire

20   space of the trunk of this vehicle, right?

21   A    Yes.

22   Q    So you would agree with me that that is a fairly

23   substantial amount of whatever's inside it.

24   A    I don't know what is the weight of it.  I don't know.

25   Q    Those bags weighed many dozens of pounds, maybe more than

PROCEEDINGS                                        82

1    a hundred pounds, right?

2    A    I don't know.  I don't know approximately how much in

3    weight.

4    Q    So just to clarify, it is your testimony that on

5    October 28th, 2019, you never touched these bags?

6    A    Correct.  Correct, I was not the one to carry it.

7    Q    You never touched the bags that were loaded into your

8    personal car?

9    A    Correct.

10              MR. WANG:  Thank you.  No further questions.

11              MS. EISNER-GRYNBERG:  No redirect.

12              THE COURT:  All right.

13              Thank you, Mr. Feng, you may step down.

14              (The witness was excused.)

15              THE WITNESS:  Thank you.  Thank you, Your Honor.

16              MR. WANG:  Your Honor, the government has -- sorry.

17              Your Honor, the government has one rebuttal witness,

18    it will hopefully be fairly short, but we do have another

19    agent who was on the scene.

20              THE COURT:  When you say "short," five, ten minutes?

21              MR. WANG:  Probably closer to ten, but I'm hoping to

22    keep it to that amount of time.

23              THE COURT:  All right.

24              And the agent is available now?

25              MR. WANG:  Yes, Your Honor.

FARQUHARSON – DIRECT – WANG                    83

1          THE COURT:  And would you call him or her to the

2    stand, please.

3          MR. WANG:  The government would call Special Agent

4    Ricardo Farquharson.

5          For the court reporter that's F-A-R-Q-U-H-A-R-S-O-N.

6          THE COURT:  Swear the witness.

7          THE WITNESS:  Please raise your right hand.

8          (Witness takes the witness stand.)

9    **RICARDO FARQUHARSON,** called as a witness, having been first

10   duly sworn/affirmed, was examined and testified as follows:

11         THE WITNESS:  Yes, I do.

12         THE COURTROOM DEPUTY:  Please state and spell your

13   name for the record.

14         THE WITNESS:  Ricardo Farquharson.  R-I-C-A-R-D-O.

15   F-A-R-Q-U-H-A-R-S-O-N.

16         THE COURTROOM DEPUTY:  Thank you.

17         THE COURT:  Thank you.  You may be seated.

18         Mr. Wang, you may proceed.

19   DIRECT EXAMINATION

20   BY MR. WANG:

21   Q    Good afternoon, sir.

22         Can you tell us where you work?

23   A    I work with the DEA.

24   Q    What's your position with the DEA?

25   A    Special agent.

1  Q    As a special agent, what kinds of cases do you

2  investigate?

3  A    Narcotics investigations to include money laundering from

4  drug proceeds.

5           THE COURT:  I assume that the defendant would prefer

6  that the witness remove his mask?

7           MS. EISNER-GRYNBERG:  Yes, please.

8           I'm sorry, yes.  Thank you.

9           THE COURT:  Would you like a face shield?

10          THE WITNESS:  If I don't have to, it's fine.

11          THE COURT:  Well, in lieu of the mask, since you're

12  not going to be permitted to wear the mask while you're

13  testifying, you are behind a plexiglass shield, but if you

14  would like a personal portable face shield, we can provide

15  one.

16          THE WITNESS:  That's not necessary.

17          THE COURT:  All right.  Thank you.

18  BY MR. WANG:

19  Q    Agent Farquharson, in October 2019, where were you

20  assigned?

21  A    I was assigned Queens as a surveillance team member.

22  Q    Briefly, are you familiar with an individual named Hanhe

23  Chen?

24  A    Yes.

25  Q    How is it that you're familiar with Hanhe Chen?

FARQUHARSON – DIRECT – WANG                    85

1   A     He was a subject of a DEA investigation.

2   Q     And is that the same investigation you just referenced

3   for October 2019?

4   A     Yes.

5   Q     And in October 2019, was the DEA actively surveilling the

6   movements and activities of Hanhe Chen?

7   A     Yes.

8   Q     And in the course of your participation in the

9   surveillance, did you encounter the defendant, Binbu Feng?

10  A     Yes.

11  Q     So focusing on October 28th, 2019, is that the date that

12  you were working a surveillance assignment?

13  A     Yes.

14  Q     About how many other officers were also on that team?

15  A     More than eight.

16  Q     What was the team's method of keeping in communication

17  with one another?

18  A     That would be by radio communication.

19  Q     And in terms of -- how actively do members of the team

20  update each other by radio?

21  A     They would periodically, depending on what they see, any

22  type of movement or anything worth putting out.

23  Q     Where was the team posted that day?

24  A     Team was posted by a warehouse.

25  Q     Do you recall approximately where that warehouse was?

FARQUHARSON – DIRECT – WANG                    86

1    A    That was in Queens.

2    Q    That day, as part of the surveillance team, where were

3    you posted personally?

4    A    I was posted in the vicinity of the warehouse.

5    Q    To be clear, did you ever physically and directly observe

6    activities at the warehouse?

7    A    No.

8    Q    You said you were in the vicinity of the warehouse,

9    correct?

10   A    Yes.

11   Q    By radio, were you able to learn as to what other

12   officers were observing at the warehouse?

13   A    Yes.

14   Q    What did you learn from other officers who were directly

15   observing the warehouse?

16   A    They broadcasted that multiple Asian males were loading

17   large, black, weighted, heavy plastic bags in the back of a

18   minivan.

19   Q    And do you remember the make and model of that minivan?

20   A    Yes, Toyota Sienna.

21   Q    And based on your training and experience as a DEA agent,

22   what did you believe that individuals involved in a money

23   laundering investigation were carrying in large weighted bags

24   being brought to a car?

25   A    Yes, we believed that may have been some kind of

1   controlled substance and/or involved cash.

2   Q     Did you make any car stops that night on October 28th?

3   A     Yes, we did.

4   Q     What car did you stop?

5   A     The Toyota Sienna that was put out over the radio.

6   Q     Why did you stop that car?

7   A     Because we had reasonable suspicion that that car was

8   carrying either bulk cash or some kind of controlled

9   substance.

10  Q     And is that because of information you received over the

11  radio?

12  A     Yes.

13  Q     Was your knowledge from the investigation also part of

14  your reasonable suspicion?

15  A     Yes.

16  Q     When you stopped the car, had you previously observed any

17  sort of traffic infraction?

18  A     I don't recall.

19  Q     When you stopped the car, who was driving?

20  A     Mr. Binbu Feng.

21  Q     Do you see Mr. Binbu Feng in the courtroom today?

22  A     Yes.

23  Q     Could you point to and indicate an article of clothing?

24  A     The gentleman sitting between defense attorney and the

25  other gentleman, black sweatshirt.

1          MR. WANG:  Let the record reflect the witness has

2    identified the defendant.

3    Q    Was anyone else in the car at the time?

4    A    No.

5    Q    Which side of the car did you approach?

6    A    I approached the passenger window.

7    Q    And upon approaching the vehicle, what could you smell

8    from the car, if anything?

9    A    Nothing.

10   Q    At any point during the car stop, did you put your head

11   inside the cabin of the vehicle?

12   A    No.

13   Q    When you approached the driver, were you able to

14   communicate with him?

15   A    We tried, but there was a language barrier.

16   Q    When you say "we," who do you mean?

17   A    Agent Callahan.

18   Q    Was anyone else with you?

19   A    At that time, just myself and Agent Callahan.

20   Q    So you were the two initial agents to stop the defendant?

21   A    Yes.

22   Q    What do you mean by a "language barrier"?

23   A    It seemed that he didn't understand quite as well

24   English.

25   Q    Did there come a time when you saw that the defendant was

1    able to communicate in a language he understood?

2    A    Yes.

3    Q    Who was he communicating with at that time?

4    A    He was communicating with Investigator Herrera.

5    Q    Is that Investigator Eladio Herrera?

6    A    Yes.

7    Q    So is it fair to said say that he arrived at the scene

8    after the car stop had already started?

9    A    Yes.

10   Q    What language was he spoking with Investigator Herrera?

11   A    They were speaking Spanish.

12   Q    Agent Farquharson, do you speak Spanish?

13   A    I don't.

14   Q    Can you recognize Spanish?

15   A    Sure, yes.

16   Q    From what you could tell, how well could the defendant

17   speak Spanish?

18   A    He seemed pretty confident.  They spoke very fluidly.

19   Didn't appear to be any type of confusion or them not

20   understanding each other.

21   Q    And to be clear, did the defendant and

22   Investigator Herrera converse in Spanish prior to any

23   examination of the vehicle?

24   A    Yes.

25   Q    What, if anything, did Officer Herrera tell you after he

FARQUHARSON – DIRECT – WANG                90

1   spoke with the defendant?

2   A     That we received consent to search the vehicle.

3   Q     What happened after Investigator Herrera told you you had

4   received consent?

5   A     We opened the back of the vehicle.

6   Q     What did you find inside the vehicle?

7   A     Big black plastic bags that was described over the radio

8   communication.

9   Q     Did you look inside the bags?

10  A     Yes.

11  Q     What did you find inside?

12  A     Inside we found sealed plastic bag containing -- clear

13  plastic bags containing green leafy substance.

14  Q     And based on the appearance of that substance and the

15  other information you had from the investigation, what did you

16  believe the substance to be?

17  A     Marijuana.

18        MR. WANG:  Agent Farquharson, I'm just going to show

19  you briefly Government Exhibit 1 in evidence.

20        (Exhibit published.)

21  Q     What is Government Exhibit 1?

22  A     That is the black plastic bags that I just described.

23        MR. WANG:  I'll show you Government Exhibit 2 in

24  evidence.

25        (Exhibit published.)

Case 1:19-cr-00557-ARR   Document 68   Filed 05/19/21   Page 91 of 97 PageID #: 243

1    Q    What do you see in Government Exhibit 2?

2    A    That is the clear plastic bags containing the green leafy

3    substance.

4    Q    I believe you said earlier that upon initial approach to

5    the vehicle, you could not smell anything, correct?

6    A    Correct.

7    Q    Upon opening the back of the vehicle, what, if any, could

8    you smell?

9    A    I could smell odor of marijuana.

10   Q    Are you familiar with the smell of marijuana based on

11   your training and experience?

12   A    Yes.

13        MR. WANG:  I'm going to show you what's been

14   admitted in evidence as Defense Exhibit A.

15        (Exhibit published.)

16   Q    Agent Farquharson, do you recognize this?

17   A    Yes.

18   Q    What is Defense Exhibit A?

19   A    Those are the cleared sealed plastic bags that was taken

20   from the black plastic bags.

21   Q    What happened after you found the marijuana?

22   A    Mr. Binbu Feng was placed under arrest.

23   Q    At any point prior to his arrest, did anyone at the car

24   stop threaten the defendant in any way?

25   A    No.

PROCEEDINGS                        92

1  Q    Before arresting the defendant, did anyone physically

2  restrain the defendant in any way?

3  A    No.

4  Q    Before the arrest of the defendant, did anyone draw a

5  weapon?

6  A    No.

7            MR. WANG:  Thank you.  No further questions at this

8  time.

9            MS. EISNER-GRYNBERG:  No cross.

10           THE COURT:  All right.  Thank you very much.

11           You may step down.

12           Does the government have any further rebuttal

13  evidence?

14           MR. WANG:  No, Your Honor.

15           (The witness was excused.)

16           THE COURT:  There was some indication before we

17  heard the testimony that counsel wanted an opportunity to sum

18  up; is that correct?

19           MS. EISNER-GRYNBERG:  Judge, I'm prepared to sum up,

20  but I would prefer to brief the issue in writing, especially

21  given that Your Honor will be preparing a report and

22  recommendation that will then be reviewed by Judge Johnson.

23           I think it would benefit both parties to have the

24  opportunity to synthesize our arguments in writing.

25           THE COURT:  And, Mr. Wang, what's the government's

PROCEEDINGS                                    93

1    views?

2               MR. WANG:  We have no objection to further briefing,

3    if the Court feels it's necessary, but on the other hand, we

4    do think that the record is fairly well developed here, we're

5    ready to proceed with an oral argument.

6               THE COURT:  You know, I can go either way.  I did

7    get prehearing legal briefs from both sides, so I think all of

8    the issues that have come up today, all the legal issues have

9    already been addressed, so I can go either way.

10              And if it's a matter of needing time to sum up, we

11   can take our lunch break and then resume after lunch.  But if

12   the defense would prefer to provide written submissions, I'm

13   not opposed to that, I just don't know if it's necessary.

14              MS. EISNER-GRYNBERG:  Yes, we'd prefer to write on

15   the issue.

16              THE COURT:  All right.  So let's just set a

17   schedule.

18              Ms. Eisner-Grynberg, how much time do you need?

19              MS. EISNER-GRYNBERG:  Judge, given that Mr. Feng is

20   not in custody, and that we will need to order the transcript,

21   could we have about a month?

22              THE COURT:  I'm really reluctant --

23              MS. EISNER-GRYNBERG:  Less is fine.  Whatever's

24   convenient for Court is fine.

25              MR. WANG:  And, Your Honor, as I'm sure you know,

PROCEEDINGS                                     94

1    this case has been lingering for quite sometime, and the

2    motion was fully briefed in the fall.

3           So I'm sure we can get an expedited order of the

4    transcript, and I'm hoping we can have an expedited briefing

5    schedule as well.

6           THE COURT:  I know that Judge Johnson, I believe,

7    has a status conference scheduled before him that has been put

8    off month to month, as this hearing was put off.  So I am

9    reluctant to defer this much longer.

10          MS. EISNER-GRYNBERG:  That's no problem, Judge.  How

11   about two weeks?

12          THE COURT:  All right.

13          MS. EISNER-GRYNBERG:  May 21st?

14          THE COURT:  That would be May 21st.

15          And how much time does the government want to

16   respond?

17          MR. WANG:  Your Honor, I think we only need one

18   week, although I think that would be --

19          THE COURT:  There will be an intervening holiday, I

20   believe.

21          MS. EISNER-GRYNBERG:  The holiday is not until the

22   31st, but whatever the government needs is fine.

23          MR. WANG:  I see.  Give me one moment, Your Honor.

24          The 28th -- no.  June 1st would be preferable, Your

25   Honor.

PROCEEDINGS                          95

1          THE COURT:  Let me just look at the calendar.

2          All right, June 1st.

3          MS. EISNER-GRYNBERG:  I can reply by June 4th, if

4    any.

5          THE COURT:  All right.  And if you decide not to

6    reply, if you can alert the Court --

7          MS. EISNER-GRYNBERG:  Yes.

8          THE COURT:  -- and the government.

9          All right, is there anything further that we need to

10   address?

11         MR. WANG:  Nothing from the government, Your Honor.

12         MS. EISNER-GRYNBERG:  No, Judge.  Thank you.

13         THE COURT:  All right, let me just state that this

14   is the first time I've had any in-person hearing in about 14

15   months, maybe a little less than 14 months, and as I said at

16   the outset, it is a brave new world.  It went surprisingly

17   smoothly, in spite of the impediments that we've all been

18   dealing.  And I wanted to thank counsel on both sides for a

19   very professional presentations in this hearing.

20         So thank you all very much.

21         MS. EISNER-GRYNBERG:  Thank you, Your Honor.

22         MR. WANG:  Thank you, Your Honor.  It's a pleasure

23   to be here before you.

24         MS. EISNER-GRYNBERG:  Thank you for coming in,

25   Judge.

PROCEEDINGS                                      96

1          THE COURT:  All right.

2          THE COURTROOM DEPUTY:  All rise.

3

4          (Whereupon, the matter was concluded.)

5

6                    *     *     *     *     *

7

8

9    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

10

11     s/ Linda D. Danelczyk              May 11, 2021

12       LINDA D. DANELCZYK                   DATE

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                                    PAGE

3    **ELADIO HERRERA**

4    DIRECT EXAMINATION    BY MR. WANG            5
     VOIR DIRE EXAMINATION  BY MS. EISNER-GRYNBERG  29
5    VOIR DIRE EXAMINATION  BY MR. WANG           30
     DIRECT EXAMINATION    BY MR. WANG           34
6    CROSS-EXAMINATION     BY MS. EISNER-GRYNBERG  39
     REDIRECT EXAMINATION  BY MR. WANG           59

7
     **BINBU FENG**
8
     DIRECT EXAMINATION    BY MS. EISNER-GRYNBERG  66
9    CROSS-EXAMINATION     BY MR. WANG           71

10   **RICARDO FARQUHARSON**

11   DIRECT EXAMINATION    BY MR. WANG           83

12

13                    *    *    *    *    *

14                      E X H I B I T S

15   GOVERNMENT              PAGE

16   1                        26

17   2                        27

18   5                        27

19   4                        34

20   DEFENSE                PAGE

21   A                        58

22

23

24

25