MEB:ADW
F. #2019R01488

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          19-CR-557 (SJ) (RLM)

BINBU FENG,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW

MARK J. LESKO
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrew Wang
Assistant U.S. Attorney
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 2

ARGUMENT .................................................................................................................. 8

I.   Law Enforcement Had Reasonable Suspicion to Stop the Defendant ............................... 8

II.  Law Enforcement Had Probable Cause to Search the Defendant's Vehicle ................... 15

III. The Defendant Consented to a Search of His Vehicle Knowingly and Voluntarily ........ 17

CONCLUSION .............................................................................................................. 19

## PRELIMINARY STATEMENT

On May 7, 2021, the Court held a hearing on the defendant's motion to suppress marijuana that was recovered from his vehicle on October 28, 2019.[1]  Two law enforcement witnesses – Investigator Eladio Herrera of the New York State Police and Special Agent Ricardo Farquharson of the Drug Enforcement Administration ("DEA") – testified that they stopped the defendant's vehicle, that the defendant verbally consented to a search of his car, and that the agents discovered marijuana in the back of the vehicle.  The defendant testified that he did not consent to a search and only spoke to agents in Spanish after his arrest.  During his cross-examination, however, the defendant was forced to admit that his sworn declaration included a false statement.  Specifically, the defendant had asserted in his declaration that he had remained in his vehicle when other individuals loaded bags containing marijuana into the back of his van, and implied that because he was in the car throughout the encounter he had no idea that the package contained significant quantities of marijuana.  The photo taken by agents performing surveillance during the transaction showed that, in fact, the defendant was outside his car and standing next to the large bags of marijuana before they were loaded into the back of his van.  See Gov't Exhibit 4.  The defendant had no good explanation for this materially false statement in his declaration.

The government respectfully submits that the defendant's testimony was not credible, that Investigator Herrera and Special Agent Farquharson were credible, and that the

---

[1] In his post-hearing brief, the defendant withdrew the portion of his motion seeking suppression of the statements he made to law enforcement on October 28, 2019.  See ECF No. 69 at 3, n.1.

government elicited ample evidence to establish that law enforcement complied with the Fourth Amendment.  Accordingly, the Court should deny the defendant's motion to suppress.

STATEMENT OF FACTS

During the hearing, both Investigator Herrera and Special Agent Farquharson testified that they were members of a DEA team conducting surveillance of an individual named Hanhe Chen.  Transcript of May 7, 2021 Suppression Hearing ("Tr.") at 8:12 – 9:16; 84:19 – 85:7.  Both witnesses have significant experience and training in narcotics and money laundering investigations, which informed their observations on the day of the defendant's arrest.  See Tr. at 6:2 – 7:15 (Herrera testifying that he has worked for the New York State Police for 27 years, including more than 20 years as an investigator, and has been a DEA task force officer for more than five years, focusing on money laundering and narcotics cases); 84:1 – 4 (Farquharson testifying that as a DEA special agent, he investigates narcotics and money laundering of drug proceeds).

Investigator Herrera explained that Chen was the target of a significant money laundering investigation.  See Tr. at 8:17 – 9:7 (noting that Chen was the target of a money laundering investigation and that there were previous money seizures connected to Chen, including one for "close to a million dollars" and another for a "quite substantial amount of money as well").  The investigation led the DEA to believe that Chen was laundering drug proceeds.  See id. at 9:8-10.

On October 28, 2019, DEA agents and other law enforcement officers were surveilling the movements of Chen.  See id. at 9:17 – 11:24 (Herrera testifying that he was part of a team that followed Chen from a residence to storage facilities in Queens); 85:23 – 86:4 (Farquharson testifying that he was part of a team surveilling a warehouse in Queens).

Investigator Herrera observed Chen "going back and forth between two storage facilities," id. at

11:25 – 12:2, and then lost sight of Chen when he changed positions to avoid detection, id. at

12:10 – 13:7.  Special Agent Farquharson did not directly observe the activities of Chen or others

at the storage facilities because he was posted to a different location in the vicinity.  See id. at

86:2 – 10.  Nevertheless, other members of the surveillance team who maintained observation of

the storage facility where Chen gathered with several other Asian men informed Investigator

Herrera and Special Agent Farquharson of what they were seeing in real time via radio.  See id.

at 10:18 – 11:5 (Herrera testifying that team members gave "constant updates" by radio to

inform others of "Everything that was going on"); 85:16 – 22 (Farquharson testifying that team

members communicated by radio and "would periodically, depending on what they see, [update

others about] any type of movement or anything worth putting out").

At one point during the surveillance, both Investigator Herrera and Special Agent

Farquharson learned from team members who were directly observing the storage facility that

Chen and several other Asian men were loading large plastic bags into the backs of vehicles.  See

id. at 14:2 – 15:4 (Herrera testifying that the team reported that "three more Asian males had

joined Mr. Chen," who were loading "large, plastic garbage bags, heavy weighted" into the back

of vehicles); 86:11 – 18 (Farquharson testifying that team members broadcasted "that multiple

Asian males were loading large, black, weighted, heavy plastic bags in the back of a minivan").

One of those vehicles was the defendant's Toyota Sienna minivan.  See id. at 15:5-9 (Herrera

testifying that he received descriptions of a pickup truck and a Toyota Sienna minivan); 78:4-5

(defendant confirming that Toyota Sienna depicted at loading dock belonged to him); 86:19-20

(Farquharson testifying that he received description of a Toyota Sienna).

3

On cross-examination, the defendant admitted that he was at the loading dock where several men were loading black plastic bags into the backs of vehicles.  See id. at 76:18-20 (Q: "And when you got to that specific location, that was a loading dock for a warehouse facility of some sort, right?"; A: "Yes").  In the sworn declaration that he submitted in support of his motion to suppress, the defendant stated that he "did not get out of the van" and that "men [he] met at the facility loaded bags into [his] truck."  See ECF No. 38, Exhibit A at ¶ 5.  However, at the hearing, the defendant admitted that he was outside of his car and on the loading dock, as depicted in Government Exhibit 4.  See Tr. at 77:24 – 78:3 (Q: "Mr. Feng, that's you on the loading dock, isn't it?"; A: "Yes. Yes. That's me, yes.").  In fact, as seen in the below cropped portion, Government Exhibit 4 showed the defendant standing directly next to a yellow cart that contained several large black bags, behind his Toyota Sienna and just a few feet from two other Asian men.



The defendant admitted that the other men in this photo were the ones who "handed [him] the objects to load in [his] car." Tr. at 79:3 – 8. Despite his admission that he was next to the bags that were loaded into his car, the defendant claimed that he never touched the bags personally. See id. at 80:11 – 17 and 82:4 – 9 (defendant testifying that he never handled or touched the bags in his car). The defendant also claimed that he was not familiar with the smell of marijuana and did not detect any unusual odors coming from the bags, which contained hundreds of pounds of marijuana. See id. at 79:24 – 80:3.

Based on their training and experience and the nature of the investigation, the agents believed that the large weighted bags being loaded into the back of the Toyota Sienna likely contained cash or narcotics. See id. at 15:10 – 22 (Herrera testifying that he concluded the bags might have contained money or drugs because of the "nature of what we were dealing with"); 86:21 – 87:2 (Farquharson testifying that he believed the bags contained controlled substances or cash). Other agents who were directly observing the loading area instructed Investigator Herrera and Special Agent Farquharson, as well as Special Agent Thomas Callahan, to pull over the defendant's Toyota Sienna. See id. at 15:23 – 16:5 (Herrera testifying that they had been "instructed over the radio" to pull over the minivan); 87:2 – 15 (Farquharson testifying that the agents stopped the Toyota Sienna that had been "put out over the radio" because they "had reasonable suspicion that that car was carrying either bulk cash or some kind of controlled substance" based on information received over the radio and his knowledge from the money laundering investigation). Investigator Herrera also recalled that an agent had broadcast on the radio that the defendant had committed a traffic violation, further justifying the car stop. See id. at 16:25 – 17:16. Investigator Herrera arrived on the scene shortly after Special Agents

Callahan and Farquharson had already performed the car stop.  See id. at 17:17 – 20.  Special

Agent Farquharson could not recall if he saw a traffic violation.  See id. at 87:16 – 18.

       After the agents stopped the defendant, Investigator Herrera approached the

Toyota Sienna from the passenger's side.  See id. at 17:25 – 18:1.  Investigator Herrera testified

that he "poked [his] head in, [his] nose in" to the cabin of the car to "make sure nobody else was

in the car," especially since the vehicle was a minivan where "somebody could be laying in the

back."  Id. at 18:5 – 20.  Investigator Herrera explained that this common practice was done for

safety reasons.  See id. at 18:10 – 25 (Herrera testifying that he poked his head in "just to make

sure that we were safe" and so that he "could see no weapons in the open," which was a common

practice during traffic stops that he developed as a state trooper "on the road by [himself]"

because "you always have to be safe").  Once Investigator Herrera put his head into the cabin of

the car, he smelled marijuana.  See id. at 18:2 – 9.

       Initially, the agents spoke to the defendant in English, who apparently understood

enough to hand over his license and registration and get out of the car, but little else.  See id. at

19:1 – 14.  Later, another member of the surveillance team came upon the scene.  When the other

team member spoke Spanish to Investigator Herrera, the defendant spoke up and volunteered that

the defendant also spoke Spanish.  See id. at 19:20 – 20:4 (Herrera testifying that an Investigator

Gonzalez came to the scene and spoke to him in Spanish).  The defendant and Investigator

Herrera, who is fluent in Spanish, were able to communicate effectively in Spanish.  See id. at

21:3 – 8.  Investigator Herrera then asked the defendant, in Spanish, if it was "okay if we take a

look what's in the vehicle."  Id. at 21:17 – 20.  The defendant appeared to understand the

question and responded by nodding his head and saying "yes" in Spanish.  See id. at 21:21 –

22:16 (Herrera testifying that the defendant's behavior indicated understanding of the question

and that the defendant nodded his head and said "sí"); 89:10 – 90:2 (Farquharson testifying that

the defendant appeared to be speaking with Investigator Herrera "fluidly" and that Herrera said

the defendant had given consent to search the vehicle).

After the defendant said "yes," the agents walked to the back of the minivan and

opened the trunk.  See id. at 22:17 – 20 (Herrera testifying that the agents went to the back of the

car); 90:3 – 5 (Farquharson testifying that the agents opened the back of the vehicle after the

defendant gave consent).  At that point, both Investigator Herrera and Agent Farquharson could

smell the odor of marijuana.  See id. at 24:2 – 7; 91:7 – 12.  Inside the car, the agents found large

black plastic bags containing large quantities of marijuana sealed in clear plastic.  See id. 23:2 –

12 (Herrera describing discovery of marijuana); 90:3 – 17 (Farquharson describing discovery of

marijuana).  As seen in an unmarked version of Government Exhibit 1 below, there was enough

marijuana to fill nearly the entire trunk area of the vehicle.  Investigator Herrera also testified

that while the marijuana was packaged in a way that appeared to be designed to conceal its smell,

such packaging does not always conceal the smell and in fact did not do so in this case.  See id.

at 64:2 – 13.



After the agents discovered the marijuana, they arrested the defendant.  See id. at 23:22 – 24; 91:21 – 22.  Prior to the arrest, no agents at the scene physically restrained the defendant, drew their weapons or otherwise coerced the defendant.  See id. at 23:13 – 21 and 35:3 – 12 (Herrera testifying that agents did not restrain defendant prior to arrest, coerce defendant, or draw their weapons); 91:23 – 92:6 (same testimony by Farquharson).

After the defendant was transported to a DEA office, the defendant spoke to Investigator Herrera in Spanish without difficulty.  See id. at 35:13 – 36:20.  The defendant told Investigator Herrera that the defendant learned Spanish because he had spent about five years living in Venezuela.  See id. at 36:21 – 37:5 (Herrera describing conversation with defendant); 73:4 – 25 (defendant testifying that he lived in Venezuela for several years and described his personal background to Investigator Herrera in Spanish).  Indeed, at the DEA office, the defendant acted as a Chinese-to-Spanish interpreter for a co-defendant who had been arrested around the same time because the co-defendant only spoke Chinese.  See id. at 37:6 – 38:1 (Herrera testifying that defendant translated Chinese into Spanish to help collect pedigree information from co-defendant); 74:1 – 4 (defendant testifying that he helped interpret Chinese into Spanish at DEA office).

<u>ARGUMENT</u>

I.    <u>Law Enforcement Had Reasonable Suspicion to Stop the Defendant</u>

The credible and consistent hearing testimony of Investigator Herrera and Special Agent Farquharson established that on October 28, 2019, law enforcement had reasonable suspicion to stop the defendant's Toyota Sienna and later developed probable cause to conduct a warrantless search of his vehicle.  As described below, specific and articulable facts led law enforcement to believe that the defendant had committed a traffic violation and that the

defendant's car contained evidence of narcotics and money laundering, justifying the car stop. And when Investigator Herrera detected the smell of marijuana, law enforcement had probable cause to search the car. All of law enforcement's actions were consistent with the Fourth Amendment, and the defendant's motion to suppress should be denied.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." United States v. Wallace, 937 F.3d 130, 137 (2d Cir. 2019) (quoting Whren v. United States, 517 U.S. 806, 809-10 (1996)). "Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." Id. (citation and internal quotation marks omitted). When assessing whether law enforcement has reasonable suspicion in the narcotics context, the inquiry asks if "the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." United States v. Glover, 957 F.2d 1004, 1010 (2d Cir. 1992).

In the first instance, the agents who stopped the defendant did so after observing him commit one or more traffic violations, which is all that is required for a car stop. See United States v. Diaz, 802 F.3d 234, 238-39 (2d Cir. 2015) ("The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity or a traffic violation.") (citations and internal quotation marks omitted). While Investigator Herrera did not directly observe a traffic violation because he arrived shortly after the car stop

9

had occurred, he recalled that an agent had broadcast on the radio that the defendant had committed a traffic violation.  See id. at 16:25 – 17:20.  Special Agents Callahan and Farquharson were the other agents on the scene, the latter of which did not recall a traffic violation.  Given that all three agents were driving in separate cars, it is therefore reasonable to infer that Special Agent Callahan is the agent who observed a traffic violation and announced it on the radio.  See United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").

Independently of any traffic violations observed by the agents, law enforcement also had reasonable suspicion to stop the defendant based on their surveillance of the warehouse. Just as in other cases involving defendants who were stopped after receiving suspicious items from suspected drug dealers, law enforcement here were aware of specific and articulable facts giving them reasonable suspicion to believe that the defendant was engaged in narcotics trafficking or money laundering.  See United States v. Davis, 430 F.3d 345, 354-55 (6th Cir. 2005) (police had reasonable suspicion to believe defendant's car contained contraband after observing him meet with a suspected drug dealer); United States v. Bustos-Torres, 396 F.3d 935, 942-43 (8th Cir. 2005) (officers lawfully stopped defendant's vehicle because they had reasonable suspicion after observing defendant engage in apparent drug deal in parking lot); United States v. Farmer, 289 F. App'x 81, 84-85 (6th Cir. 2008) (officers lawfully stopped defendant's vehicle because they had reasonable suspicion after observing defendant's behavior at hotel consistent with narcotics trafficking).  For example, in Davis, the police had previously

10

stopped several individuals on separate occasions after they met with a drug dealer who was suspected of transporting drugs between Chicago and Detroit, and the police later found each such individual in possession of a large amount of drugs.  See 430 F.3d at 349.  The police later followed the drug dealer and a car with a Michigan license plate to a residence, where they saw the defendant meet with the drug dealer in the driveway.  Id.  At the time, investigators had not previously encountered the defendant and did not know who he was.  Id.  They also saw two boxes of laundry detergent near the defendant's car, which were similar to boxes found at a drug packing location connected to the drug dealer.  Id.  Based on those facts, the Sixth Circuit stated that the police had reasonable suspicion to believe that the defendant's car contained narcotics. Id. at 354-55.

Just as in Davis, law enforcement in this case was not previously aware of the defendant, but they developed reasonable suspicion that he was engaged in drug trafficking or money laundering after they saw him interact with an investigative target and received suspicious packages from him.  Earlier in the day, agents were surveilling Chen, the target of a significant money laundering investigation.  See Tr. at 8:12 – 9:16; 84:19 – 85:7.  Chen had previously been connected to significant money seizures, including one for "close to a million dollars," and the DEA investigation connected the money seizures to drug trafficking.  See id. at 8:17 – 9:10.  Law enforcement tailed Chen to two storage facilities in Queens, where Chen was "going back and forth" between the facilities.  Id. at 11:25 – 12:2.  Later, agents saw that several Asian men had joined Chen, which they reported over the radio.  See id. at 10:18 – 11:5; 85:16 – 22.  The Asian men were loading large, heavy, weighted plastic bags into the backs of vehicles, including the defendant's Toyota Sienna.  See id. at 14:2 – 15:9; 86:11 – 18; 86:19-20.  Contrary to the false claims in his sworn declaration, one of those Asian men was the defendant, who

stood next to the bags of marijuana that were later found in his car.  See id. at 76:18-20; 77:24 –

78:3.  The agents who observed the activity at the loading area instructed Investigator Herrera

and Special Agent Farquharson to pull over the Toyota Sienna after it left the loading area.  See

id. at 15:23 – 16:5; 87:2 – 15.  Taken together, the foregoing constituted specific and articulable

facts that would lead a law enforcement agent "familiar with the practices of narcotics couriers"

to reasonably suspect that the defendant's Toyota Sienna contained drugs or drug proceeds, even

if the "pattern of behavior is innocuous to the untrained observer."  Glover, 957 F.2d at 1010; see

also United States v. Haynesworth, 879 F. Supp. 2d 305, 310 (E.D.N.Y. 2012) ("The conduct

forming the basis of reasonable suspicion need not be—and, indeed, often is not—illegal.")

(citing United States v. Sokolow, 490 U.S. 1, 9 (1989)).

        The defendant compares this case to United States v. Bayless, 201 F.3d 116 (2d

Cir. 2000) and argues that the facts established at the hearing show nothing more than the

defendant's "mere propinquity" to Chen.  See ECF No. 69 at 6-7 ("Def. Br.").  The defendant is

wrong.  First, while the district court found reasonable suspicion based on several factors in

Bayless, the Second Circuit found that the most important factor was the strange behavior of men

who loaded duffel bags into the trunk of the car of a defendant, including their speed, their

apparent desire to disassociate from the car after loading it, and their lack of communication with

the driver.  See 201 F.3d at 134.  The other factors in Bayless, such as the early morning hour of

the conduct and its occurrence in an area known for drug activity, were "sometimes innocuous

factors" that took on more significance in light of the odd behavior of the men who loaded the

trunk.  Id.  In this case, the defendant asserts that his driving to a storage facility, receiving

garbage bags into his trunk, and then driving away were "wholly innocuous."  Def. Br. at 6.

However, the reasonable suspicion inquiry calls for evaluating those factors in combination with

the fact that a major money laundering suspect met with several other men to transfer large, heavy garbage bags from a storage facility to the trunk of another person who drove away shortly thereafter.  The defendant's conduct, in light of Chen's travel to a storage facility and the suspicious conduct of several men moving large bags into the trunk of the defendant's car, constituted specific and articulable facts giving rise to reasonable suspicion.

Nor does the defendant's "propinquity" argument withstand scrutiny.  The defendant cites United States v. Tehrani, 49 F.3d 54, 59 (2d Cir. 1995) for the unremarkable proposition that merely being in the presence of "others independently suspected of criminal activity" cannot create reasonable suspicion or probable cause.  See Def. Br. at 6.  However, the defendant here was not merely in the presence of Chen.  Instead, unlike in the cases cited in the defendant's brief, the defendant met Chen at a storage facility along with several other men and received large, heavy plastic bags in a fashion that was consistent with the storage and transport of large quantities of drugs or drug proceeds.  See Def. Br. at 6-7 (citing Coppinger v. Metro-N. Commuter R.R., 861 F.2d 33, 36 (2d Cir. 1988) (no reasonable or particularized suspicion of drug use where plaintiff was merely sitting at a table with other employees with cups containing alcohol); United States v. Goines, 604 F. Supp. 2d 533, 536 (E.D.N.Y. 2009) (no reasonable suspicion where defendant was merely walking several feet separately from and behind two people passing what appeared to be a marijuana cigarette); Reid v. Georgia, 448 U.S. 438, 441 (1980) (no reasonable suspicion based merely on fact that petitioner walked ahead of someone else in an airport concourse and occasionally looked back at the other person); United States v. Sanchez, 719 F. Supp. 128, 132 (E.D.N.Y. 1989), aff'd, 902 F.2d 1556 (2d Cir. 1990) (no reasonable suspicion to believe yellow shopping bag retrieved from quiet residential home contained drugs or money, where suspect's only alleged connection to drug dealing was reports

13

from unidentified residents of an apartment building that unspecified drug transactions took place at an apartment and that the suspect matched the description of someone who lived in the apartment)).

Finally, the defendant's collective knowledge argument is of no moment.  See Def. Br. at 7-8.  As discussed above, reasonable suspicion existed based on the witnesses' knowledge of the investigation concerning Chen and the observations of multiple agents on October 28, 2019, including those communicated to the rest of the team by radio.  See Colon, 250 F.3d at 135.  The defendant suggests that the collective knowledge doctrine can be invoked only if the government presented testimony by the agents who passed along information to Investigator Herrera and Special Agent Farquharson.  See Def. Br. at 7-8.  That is not the law.  A suppression hearing is a hearing on a "preliminary question" that is not governed by the Federal Rules of Evidence.  See Fed. R. Evid. 104(a) and 1101(d)(1).  The Court therefore may consider the testimony of Investigator Herrera and Special Agent Farquharson as to what they heard from other agents to establish the truth of those matters.  In any event, the defendant incorrectly claims that the Court "has no basis on which to judge" the reliability of the witnesses' testimony.  See Def. Br. at 7.  In fact, the witnesses' testimony was strongly corroborated by both Government Exhibit 4, which showed the defendant helping to load heavy plastic bags into his car, and the defendant's own admissions that he drove a Toyota Sienna and helped others on the loading dock.[2]

---

[2] The government separately notes that the defendant's reliance on United States v. Dudley is misplaced.  See Def. Br. at 7.  In that case, arresting officers had no personal knowledge of the basis for an I-Card that had been issued by a detective who did not personally participate in the arrest.  See 18-CR-670 (SJ) (RER), ECF No. 49 at 9 ("The validity of an arrest pursuant to an I-Card derives wholly from the information provided to the law enforcement official who issues the I-Card.  Without this information, the Court cannot find that the I-Card

II.     Law Enforcement Had Probable Cause to Search the Defendant's Vehicle

After the agents stopped the defendant, but before they searched the Toyota Sienna, Investigator Herrera detected smelled marijuana coming from the vehicle.  Combined with the other facts described above, the smell of marijuana gave the agents probable cause to search the defendant's Toyota Sienna without a warrant.  While warrantless searches are normally considered unreasonable under the Fourth Amendment, the "'automobile exception' permits law enforcement officers to search without a warrant 'a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband.'"  United States v. Babilonia, 854 F.3d 163, 178 (2d Cir. 2017) (citations omitted).  "If the exception applies, 'it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.'"  Id. (quoting United States v. Ross, 456 U.S. 798, 825 (1982)); see also United States v. Navas, 597 F.3d 492, 497 (2d Cir. 2010).  It is well settled that the odor of marijuana provides probable cause to search the entirety of a vehicle, including its contents.  United States v. James, No. 10 CR 1293 (RPP), 2011 WL 6306721, at *6 (S.D.N.Y. Dec. 16, 2011), aff'd, 520 F. App'x 41 (2d Cir. 2013) (collecting cases); see also United States v. Goolsby, 820 F. App'x 47, 49 (2d Cir. 2020) (odor of marijuana and defendant's admission that he had been smoking marijuana earlier gave probable cause to search vehicle); United States v. Little, 945 F. Supp. 79, 83-84 (S.D.N.Y. 1996) (smell of marijuana, defendant's admitted use of marijuana, and discovery of bullets on defendant's person constituted probable cause to search trunk of car); United States v. Anguiano, No. 14-cr-711 (NSR), 2015 WL 4528185, at *4 (S.D.N.Y. July 27, 2015) ("If a police

provided probable cause to arrest the Defendant.").  Here, by contrast, the testifying witnesses had personal knowledge of the facts supporting the stop of the defendant's vehicle and were able to testify on the substance of the information they had received from other agents.

officer who is trained and experienced in detecting narcotics smells marijuana during a traffic

stop, the officer has probable cause to search the vehicle for contraband.") (citations omitted).

The defendant argues that the smell of marijuana cannot factor into the probable

cause inquiry because it was the result of an unreasonable search. See Def. Br. at 8-9. Even

assuming that Investigator Herrera conducted a search at the moment he placed his head or nose

into the cabin of the car, that search did not violate the Fourth Amendment. See United States v.

Levy, 217 F. Supp. 3d 643, 666 (E.D.N.Y. 2016) ("The Fourth Amendment only prohibits

unreasonable searches and seizures, the inquiry of which is driven by a balancing of the nature

and quality of the intrusion on the defendant's Fourth Amendment interests against the

governmental interests alleged to justify the intrusion.") (citation and internal quotation marks

omitted). Investigator Herrera's intrusion into the cabin of the Toyota Sienna was extremely

limited and performed for safety reasons, as he did not know if there might be anyone else in the

back of the minivan or if there might be weapons. See Tr. at 18:10 – 25. In the context of a car

stop performed after the defendant received large bags from a suspected launderer of drug

proceeds, such a search was reasonable and did not violate the Fourth Amendment. See Levy,

217 F. Supp. 3d at 667 (officer leaning head into car to get better look at interior was reasonable

where officer "had a clear interest in taking safety precautions" during car stop in early morning

hours in high-crime neighborhood, even where there was no reason to think "that anyone could

reach for a gun in the car").

Lastly, the Court should reject the defendant's argument that Investigator Herrera

could not have smelled marijuana from the front passenger window. See Def. Br. at 9-10. In

support of that argument, the defendant points out that Special Agent Farquharson did not smell

marijuana from the passenger door. Id. at 9. But given that Special Agent Farquharson did not

put his head or nose into the cabin of the car, that fact is unsurprising.  The defendant also claims

that he could not smell any marijuana coming from the driver's seat.  Id.  Yet as described

earlier, the defendant's testimony as a whole was self-contradicting and unworthy of belief.  And

as to the vacuum packaging, Investigator Herrera explained that such packaging does not always

conceal the smell of narcotics and in fact did not do so in this case.  See Tr. at 64:2 – 13.  It is

also worth mentioning that there were about 100 pounds or more of marijuana in the back seat of

the Toyota Sienna, which contained an open cabin with nothing separating the trunk from the

front passenger window.  See id. at 24:25 – 25:5; Tr. at 34:7 – 24; Government Exhibit 1;

Defense Exhibit A.  Under those circumstances, the agents' testimony was credible.

III.      The Defendant Consented to a Search of His Vehicle Knowingly and Voluntarily

               While the agents had probable cause to conduct a warrantless search of the

defendant's Toyota Sienna, their search of the vehicle was also permissible because the

defendant consented to the search.  See United States v. Echevarria, 692 F. Supp. 2d 322, 336

(S.D.N.Y. 2010) ("one of the specifically established exceptions to the requirements of both a

warrant and probable cause is a search that is conducted pursuant to consent") (quoting

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).   The "ultimate question presented is

whether the officer had a reasonable basis for believing that there had been consent to the

search."  United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (internal quotation and citation

omitted).  The voluntariness of consent is a question of fact that is determined from the totality of

the circumstances.  Schneckloth, 412 U.S. at 227, 232–33.  Consent that is coerced, either by

explicit or implicit means, does not pass constitutional muster.  Id. at 228.  In deciding whether

consent was voluntarily given, courts must balance two competing concerns—the legitimate

needs of law enforcement, and the "equally important requirement of assuring the absence of coercion." Id. at 227.

Based on the hearing testimony, the government satisfied its burden of demonstrating that the defendant gave consent voluntarily, see Schneckloth, 412 U.S. at 222 (government has burden of demonstrating consent was given voluntarily) (citations omitted), and that the agents who stopped the defendant "had a reasonable basis for believing that there had been consent to the search," Garcia, 56 F.3d at 423. Investigator Herrera testified that during the car stop, an Investigator Gonzalez arrived on the scene and spoke to Herrera in Spanish. See Tr. at 19:20 – 20:4. The defendant then volunteered that he spoke Spanish and proceeded to communicate with Investigator Herrera in Spanish. See id. at 21:3 – 8. Special Agent Farquharson confirmed that the defendant and Investigator Herrera spoke Spanish during the car stop. See id. at 89:10 – 90:2. Investigator Herrera then expressly asked the defendant for permission to search the car, and the defendant both nodded his head and said yes in Spanish. See id. at 21:17 – 22:16. Moreover, the defendant conceded that he knew officers wanted to search his car. See id. at 70:11 – 15 (defendant testifying that despite language difficulties, he exited his car because "normally when the cops want to check a vehicle, they will tell the driver to get out"). Based on the defendant's clear understanding of the agents' desire to search the car, Investigator Herrera's express question, and the defendant's affirmative response, the Court should find that the defendant voluntarily consented to a search of his car.

In response, the defendant takes issue with Investigator Herrera's recollection during meetings with the government before the suppression hearing because he did not previously mention Investigator Gonzalez. See Def. Br. at 11. But this is not surprising. As Investigator Herrera recalled, Investigator Gonzalez "had come by" after the defendant was

18

already outside of his vehicle.  Tr. at 19:20 – 20:4.  In other words, Investigator Gonzalez did not

personally participate in the car stop.  It was therefore reasonable for Investigator Herrera to not

characterize Investigator Gonzalez as being "on" the car stop.

CONCLUSION

For the reasons set forth above, the government respectfully submits that the

Court should deny the defendant's motion in its entirety.

Dated:      Brooklyn, New York
            June 4, 2021

                                    Respectfully submitted,

                                    MARK J. LESKO
                                    ACTING UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    Attorney for Plaintiff
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

                        By:    /s/ Andrew Wang
                               Andrew Wang
                               Assistant United States Attorney
                               (718) 254-6311